**Melvin WILNER, d/b/a Wilner Construction Co., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 404–89C.

United States Claims Court.

May 30, 1991.

As Modified on Denial of Reconsideration July 19, 1991.

---

Matthew R. Rutherford, San Diego, Cal., for plaintiff.

J. Peter Mulhern and Samuel C. Watkins, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant.

## OPINION

NETTESHEIM, Judge.

This construction contract case is before the court after trial on the merits. Melvin Wilner, d/b/a Wilner Construction Co. ("plaintiff"), seeks recovery for alleged government-caused delay arising in conjunction with construction of a building. At issue is whether any delays along the "critical path" leading to completion of the building were attributable to either the Government or the contractor or were unapportioned concurrent delays caused by both parties.

## BACKGROUND

■ When the critical path is at issue, the Government may only be liable for delays that it caused if such delays occurred along that path. *Broome Constr. v. United States,* 203 Ct.Cl. 521, 528, 492 F.2d 829, 833 (1974). While not subject to concise definition,

> [e]ssentially, the critical path method is an efficient way of organizing and scheduling a complex project which consists of numerous interrelated separate small projects. Each subproject is identified and classified as to the duration and precedence of the work. (*E.g.*, one could not carpet an area until the flooring is down and the flooring cannot be completed until the underlying electrical and telephone conduits are installed.) The data is then analyzed, usually by comput-

er, to determine the most efficient schedule for the entire project. Many subprojects may be performed at any time within a given period without any effect on the completion of the entire project. However, some items of work are given no leeway and must be performed on schedule; otherwise, the entire project will be delayed. These latter items of work are on the "critical path." A delay, or acceleration, of work along the critical path will affect the entire project.

*Haney v. United States*, 230 Ct.Cl. 148, 167–169, 676 F.2d 584, 595 (1982); *see also Fortec Constructors v. United States*, 8 Cl.Ct. 490, 504–05 (1985) (the critical path method "breaks down the entire project into individual tasks and assigns a number of days anticipated to perform each task"), *aff'd*, 804 F.2d 141 (Fed.Cir.1986); *G.M. Shupe, Inc. v. United States*, 5 Cl.Ct. 662, 728 (1984) ("Delay involving work not on the critical path generally had no impact on the eventual completion date of the project."). Robert Marshal Freas, a Senior Consultant with Warner Construction Consultants, Inc., who testified as defendant's expert in the fields of critical path and delay analysis, defined the critical path as "the longest path in the schedule on which any delay or disruption ... would cause a day-for-day delay to the project itself.... Those activities must be performed as they are scheduled and timely in order for the project to finish on time...."

The critical path may continually evolve. After work commences, "items not originally on the critical path can become critical." *Fortec*, 8 Cl.Ct. at 505 (citing *Shupe*, 5 Cl.Ct. at 728). Therefore, in order to grasp accurately the delays that a project takes on, the critical path should be updated regularly. *Id.* Plaintiff professes that he frequently created such updates, but only one "progress schedule," made on October 5, 1985, two months after the start of construction, is in evidence.[1]

■ Determining responsibility for delay is essential. A contractor typically may not recover if government-caused delay is concurrent with additional delay not caused by the Government, such as weather or contractor delay. *E.g., Spirit Leveling Contractors v. United States*, 19 Cl.Ct. 84, 96 (1989); *Beauchamp Constr. v. United States*, 14 Cl.Ct. 430, 437 (1988). This rule is less rigid than it may appear. As stated by the Federal Circuit:

> The evidence cited ... is sufficient to uphold the ... factual finding that appellant caused the delay.

This conclusion, however, does not mean that appellant cannot prevail. The case the government relies on to support the proposition that a contractor cannot recover when there is concurrent delay, *Merritt–Chapman & Scott Corp. v. United States*, 528 F.2d 1392, 208 Ct.Cl. 639 (1976), did not hold that a contractor could not prove the government's delay separate and apart from that chargeable to the contractor.

The general rule is that "[w]here both parties contribute to the delay neither can recover damage[s], unless there is in the proof a clear apportionment of the delay and expense attributable to each party." *Blinderman* [*Const. Co., Inc. v. U.S.*], 695 F.2d [552] at 559 [Fed.Cir. 1982], quoting *Coath & Goss, Inc. v. United States*, 101 Ct.Cl. 702, 714–715 (1944). Courts will deny recovery where the delays are concurrent and the contractor has not established its delay apart from that attributable to the government.

*Klingensmith, Inc. v. United States*, 731 F.2d 805, 809 (Fed.Cir.1984).

## FACTS

On May 1, 1985, plaintiff submitted a sealed bid proposal to the United States Navy, Naval Facilities Engineering Command ("NAVFAC"), in response to Invitation for Bids N62474–83–B–2525 for construction of the approximately 8,000

---

1. Paragraph 59 of the contract's General Provisions, concerning progress charts, required the contractor routinely to "prepare and submit ... a practicable schedule, showing the order in which the Contractor proposes to carry on the work...." The contractor could submit the schedule in any form, not necessarily as a critical path.

square-foot Location Exchange (the "project" or "building") located in Margarita Area 33 of Camp Pendleton, California. The proposal also encompassed site improvements and gasoline islands. NAVFAC accepted plaintiff's bid price of $880,944.00 on July 3, 1985, and construction began on August 5, 1985.

Plaintiff, now retired, was the operator and owner of his company from 1961 to 1988. During the last ten years of plaintiff's involvement with his company, government contracts constituted approximately 90 percent of plaintiff's work. Plaintiff spent all of his time supervising construction of the Location Exchange, as well as construction of one other facility at Camp Pendleton. He had final authority over all correspondence his company made to the Officer in Charge of Construction (the "OICC") and the Resident Officer in Charge of Construction (the "ROICC").

Plaintiff's suit seeks equitable adjustment of the contract for delays arising in connection with this project. The original contract completion date was August 14, 1986. However, the building was not usable until March 10, 1987. As the cause of the setbacks in construction, plaintiff ascribes five broad items of government-caused delay, some of which involve the building itself and others which concern site work surrounding the building: 1) inaccurate specifications for fabrication and installation of hollow metal doors and frames, as well as for the attached finished hardware; 2) unclear dimensions of and installation requirements for precast concrete sills; 3) defective roofing plans; 4) numerous delays in receiving responses and clarifications from NAVFAC regarding site work; and 5) tardy installation of refrigerator boxes by NAVFAC. Defendant agrees that these items spawned delay, but disputes either its responsibility for and/or the relevance of these events. Each item of delay is addressed in turn. The evidence concerning these delays derived largely from the direct examination of plaintiff and

from exhibits introduced during that examination.

### 1. *Hollow metal doors and frames and finished hardware*

Plaintiff claims 46 calendar days of delay for these items, which consist of several subparts. Initially, plaintiff testified concerning a problem achieving the necessary "fire rating"[2] for the six exterior doors of the building. In plaintiff's view, had he supplied the doors specified, they would not be fire rated due to the specification of incompatible hardware. However, the need for fire doors was absolute in order to comply with applicable safety regulations. Plaintiff also testified concerning difficulties in clarifying the correct hardware and the proper dimensions for the hollow metal doors and frames. According to plaintiff, determining the correct hardware was a prerequisite to the ordering of the frames.

The delays associated with the dimensions and hardware for these doors and frames are summarized best in a letter dated December 14, 1985, from plaintiff to Lt. Steven Richard Fredette, the Assistant ROICC.

As early as Aug. 21, 1985 on the submittal #15, we professionally denoted that there were errors in the finished hardware for the project. Seven items were specifically denoted in the [hardware] schedule that were not in compliance with fire requirements. This was also discussed verbally at the pre-con by Mr. Steven Wilner [plaintiff's son] prior to the submittal. The result of the return on Oct. 3rd 1985 from your office was a request for some additional catalog cuts plus the addition of Panic Hardware on doors D1 and D2. Panic hardware is not a minor variation and [its] cost is considerable. No modification was made to the contract and the problems that still exist at the present time for the finished hardware ... [have] not been resolved.

Discussions were held with Mr. Dale Saunders of ARCHITECTS PACIFI-

---

**2.** "Fire rating" refers to the amount of time a door and frame can withstand a fire. To meet minimum safety requirements, such doors must

have specialized hardware, including a positive latch, a label denoting it a fire door, and a positive closure.

CA'S [3] office upon the return of submittal # 15 and assurance was given that corrections will be forthcoming and care will be taken in the submittal # 17 of the hollow metal, doors, and frames to coincide with the correction of the errors. During the interim waiting for receipt of the submittal on finished hardware, we submitted on Sept. 11, 1985 the drawings for the hollow metal, doors, and frames. (Submittal # 17)

Submittal # 17 of the Hollow Metal, Doors, and Frames was returned approved on Sept. 27, 1985 prior to the receipt of the finished hardware submittal. Flags have been denoted on Submittal # 17, which is an excepted [sic] industry standard requesting clarification from the A/E [architect and engineer]. The flags were addressed and changes were made to doors D1 and D2.

With the return of the finished hardware submittal on Oct. 3rd after the return of the hollow metal, doors submittal on Sept. 24th, it was obvious that the errors in coordinating the two items had not been done. I spoke to you and the A/E and was assured that the matter will be looked into and a rapid resolution of the errors would be forthcoming. We had anticipated on erecting the masonry walls prior to pouring the interior slabs. It was now necessary to change all our operations to try and mitigate the delay of construction that was evident. Erection of the masonry would have been stopped immediately without the hollow metal, doors and frames. This was done at a large expense to our company, without compensations by the government, and none was asked in the efforts of trying to cooperate and not have a conflict. . . .

With each change that was taking place from the period of Oct. 3rd . . . until Nov. 6th, fabrication of the hollow metal . . . Doors and Frames was delayed. We spe-cifically (even though we had approved drawings on Sept. 4th) made new drawings showing the revisions requested by your office and hand delivered them on Nov. 6th, 1985. We advised you that within 24 hours of receipt that fabrication would commence on the approved submittal.

It is evident that utter disregard was made of our request. On Nov. 23, 1985 we received the submittal of Nov. 6th, making considerable changes to the approved drawing of Sept. 4th. Further more [sic] . . . [the subcontractor] . . . had started manufactur[ing] in their shop as they had *approved* drawings and were made to stop. As of this date, no manufacturing is going on!

Until the problems are solved by your office, we do not have the ability to determine the extent of the claim. We demand immediate attention and resolution of the problems that . . . [have] been existing for almost 4 months.

(Emphasis in original.) According to plaintiff's testimony, delivery of the exterior hollow metal frames occurred between December 6–8, 1985. Since the 7th and 8th fell on a weekend, Friday the 6th would have been the most likely date of delivery. Plaintiff began installation on Monday, December 9, 1985.[4] The building was ready for installation of the exterior frames on October 24, 1985, one day after the pouring of the concrete foundation stem walls. As of that date, plaintiff believed that the hollow metal doors and frames were on the critical path.

Defendant's position on this delay is based on the testimony of Mr. Freas, who stated that fabrication of the hollow metal doors and frames was of no import because it was never on the critical path. The witness testified that the critical path bypassed the hollow metal doors and frames by progressing from the slab work directly into the masonry.

---

3. Architects Pacifica Limited ("APL") was the architect responsible for drawing the plans and specifications for this project.

4. In reliance upon defendant's stipulations that neither the fabrication and installation of the interior hollow metal doors and frames nor the installation of the diebold windows would impact defendant's view of the critical path, plaintiff waived presenting testimony and exhibits concerning these items of construction.

### 2. *Precast concrete sills and lintels*

Plaintiff claims that construction was delayed from January 9, 1986, to March 23, 1986, a total of 73 calendar days, due to late delivery of precast concrete [5] sills and lintels that were to be incorporated into the walls for the building. As the cause of this delay, plaintiff points to unclear government specifications and clarifications concerning these sills.

Plaintiff was to install precast concrete sills on the south wall of the building underneath a section of glass blocks [6] and over the exterior doors. The lintels were to rest on top of the glass blocks. Thus, the length of the sill section had a direct relation to the length of the glass block section. Therefore, before the sills could be constructed off-site, the length of the sill and glass block section needed to be certain. For several reasons plaintiff claimed delay in ascertaining the correct length of the glass block section. Initially, plaintiff encountered difficulty in obtaining glass blocks to meet both the specifications addressing light transmittal and the size of the blocks. According to plaintiff, glass blocks were not available in both the size and color specified in the plans. Problems also arose regarding the proper sizes of the joints where these blocks abutted each other. Plaintiff testified that the sizes of these joints were not indicated in the plans or specifications.

Next, a problem surfaced concerning the connections in the south wall of the building where the sills were to interlock and rest on top of pilasters, or vertical support posts. In plaintiff's words, the connections as designed were structurally inferior, thereby undermining the structural integrity of the wall. Therefore, according to plaintiff, the connections had to be redesigned in order to enhance stability. Due to the interlocking of the sills and pilasters, the sills could not be fabricated until NAVFAC had these new joints redesigned. The new joints were detailed in drawing

"R–4," which bears the date November 14, 1985.

Another problem was the compatibility of the size of the glass blocks, which were intended to measure weight inches apiece in length, with the length of the sills for the south wall of the building. According to plaintiff, the length of the wall as indicated in the plans was not divisible by eight. Based on his belief that the glass blocks could not be cut or divided into narrower segments, plaintiff concluded that the planned length of the south wall was in error. Eventually, although the project's Architects Pacifica Ltd. ("APL") never verified the proper length of the south wall, a solution was reached by including a solid, six-inch non-glass block section to the end of the south wall.

Construction of the building's west wall was delayed due to problems with the length of a precast sill and the size of the joints connecting the glass blocks. The problems with these glass blocks were similar to the problems with the glass blocks on the south wall. Along the east wall of the building, changes were made to the slope of the wall panels between the sill and the lintel.

On January 8, 1986, construction of the walls had progressed to a sufficient height that the sills were the next item in the construction of the walls. Due in part to the above delays, plaintiff contends that fabrication of the precast sills did not start until roughly January 21, 1986, and the sills were not delivered to the site until March 21, 1986. Fabrication of precast sills normally takes 60 calendar days. Installation of the sills began on March 24, 1986.

Defendant agrees that a delay concerning precast sills transpired, but places responsibility upon plaintiff and argues that the delay in fact lasted 66 workdays and occurred between December 12, 1985, and April 10, 1986. Specifically, Mr. Freas stat-

---

5. "Precast concrete" is concrete that has been shaped into form prior to delivery to or installation on the construction site.

6. The glass blocks are an opaque material installed in rows as part of the wall of the building. Light travels through these glass blocks, thereby providing illumination for the interior of the building during daylight hours.

ed that 53 workdays of that delay from January 9 to March 20, 1986 were due to "late fabrication" of the sills by plaintiff due to his late presentment of submittals, when combined with the lengthy fabrication time. The other 13 workdays of delay resulted from tardy completion of the walls up to a point where they could receive the sills and from the need to re-drill holes in the precast sills once they arrived on site. These shorter two items of delay took place between December 12 and 31, 1985, and March 30 and April 10, 1986, respectively.

### 3. *Roofing: structural steel and design*

The fabrication of the steel, which was plaintiff's responsibility, was originally defective in that some of the holes where the steel was to be bolted together would not align properly. This problem was noted in a letter from plaintiff to Lt. Fredette dated May 13, 1986. In an attempt to erect this structural steel, plaintiff's subcontractor performed so poorly that plaintiff removed him from the job. Although plaintiff was able to finish the work, a delay did ensue.

After a re-design to correct the alignment problem, the steel was further defective in that it lacked the strength to support the weight of one of the heater, ventilation, and air conditioning ("HVAC") units, thereby causing the roof to deform. Plaintiff did not become aware of this defect until after installation of the HVAC units. As a result, plaintiff fabricated new, reinforced structural supports, which also served to reduce vibration. This fabrication took from June 6, 1986, to June 15, 1986. The completion of the structural framing was a prerequisite to commencing other roof work.

Defendant contends that plaintiff's inability to align and install the structural steel properly caused 34 workdays of delay from May 2 to June 18, 1986. Concerning

the reinforcement of the HVAC supports, Mr. Freas placed responsibility for this delay on NAVFAC. Due to the timing of this delay, which occurred from June 6 to 15, Mr. Freas considered it an item subsidiary to the overall 34 workday delay caused by plaintiff and therefore gave the reinforcement delay no weight. Plaintiff claims the right to recover for nine days of government-caused delay due to the redesign of the steel supports.

Plaintiff asserts that errors in the design of the roof itself delayed the project's completion by 102 calendar days, from June 26, 1986, to October 7, 1986. Although totalling 102 days' delay, plaintiff is claiming 99 days of delay for roofing design in this lawsuit.[7]

The roof, as designed, called for water drainage to be directed by manipulating the contours of the roof so that its elevation decreased toward the roof's four drains. These contours were created by the use of "tapered insulation" that rests on top of the metal decking portion of the roof. This specially-made insulation was to be fabricated off-site according to the plans. However, the plans were defective in that some of the drains were shown at elevations that were not the lowest elevations of the roof.[8] Therefore, it was necessary to redraw the plans so that drains could be installed at the proper elevations. Accordingly, the tapered insulation could neither be ordered nor fabricated until the plans were corrected. Although able to install the roof by June 26, 1986, plaintiff did not receive the corrected design until August 8, 1986.

Delays also occurred due to the improper size of the pans for the roof drains, as specified in the plans. As required originally, the small pans could not accommodate the drains. Eventually, after specifying new-sized pans that could not be located, the size of the pans was increased on

---

7. According to plaintiff, he purposefully omitted three days of delay from his claim because, in plaintiff's words, it would cost too much to contest these three days and he was tired of contesting such delays with the ROICC. These delay days concerned painting weld joints on the roof.

8. Plaintiff first informed the ROICC of the defective plans two weeks prior to completion of the metal decking, or roughly on June 12, 1986.

August 28, 1986. The correct pans arrived on site on September 15, 1986.

Plaintiff asserts he could not have begun work on the roof until the tapered insulation arrived on-site. If construction had commenced any earlier, plaintiff testified that he would have risked incurring water damage, which would have led to a defective roof. The delay for the roofing design ended on October 7, 1986, when the first work on the roof commenced. Installation of the roof was complete by October 29, 1986.

Concerning installation of the tapered insulation, Mr. Freas attributed 62 workdays of delay to NAVFAC for tardy redesign of the roof. This delay ran from June 26, 1986, and ended on September 22, 1986. The witness ascribes delay to plaintiff from September 27 and October 7, 1986, a period of eleven workdays, due to his untimely mobilization of the roofing subcontractor.

### 4. *Site work*

Plaintiff claims 52 days of overall delay for the site work, which occurred between December 1986 and February 1987. Plaintiff places importance on certain "historical" delays in site work that subsequently impacted the critical path of the project. According to plaintiff's counsel, the delays in receiving correct information from NAVFAC "only compounded the problems later on in the project, leaving ... [plaintiff] to handle several different matters at the same time.... [I]f ... the government [had] provided this information sooner, ... [plaintiff] could have devoted his attention to other site development work at that point."

On July 12, 1985, plaintiff sent a letter to the ROICC requesting a site tour to inform plaintiff of the location of all underground utilities. Such a tour did not take place until August 6, 1985, and a survey of the water and sewer lines did not transpire until 13 days later on August 19. Subsequently, a problem arose concerning the installation of a sewer line. According to plaintiff, the sewer line as planned would have intersected with an existing steam line. Plaintiff informed the OICC of the problem in "Request for Information" ("RFI") No. 18, submitted on October 18, 1985. Due to numerous delays and unclear specifications, plaintiff did not begin digging out the sewer line until June 17, 1986. He could not undertake the other elements of the site work until after the new sewer line was installed. Defense counsel stated during trial that none of these early delays was plaintiff's responsibility.

Concerning the site delays that directly impacted the critical path, several items of delay transpired, some of which were cumulative. One dispute arose involving the correct material to be used for paving around the gasoline islands. The drawings called for asphalt to be applied, the use of which would have been environmentally unsafe.[9] Plaintiff notified the ROICC of this problem on July 10, 1985. Two months later, in Proposed Change Order ("PCO") No. 4 dated September 17, 1985, the ROICC requested a cost proposal for installing concrete slabs around each fuel island. In response, plaintiff submitted a cost proposal on October 10, 1985. On February 7, 1986, however, due to subsequent price increases from plaintiff's supplier and the ROICC's failure to respond to plaintiff's cost proposal, plaintiff withdrew his October 10 cost proposal.

On March 19, 1986, the ROICC cancelled PCO No. 4. Pursuant to a meeting held June 27, 1986, at which plaintiff and members of the ROICC staff were present, the ROICC decided, on July 1, 1986, to install the asphalt as per the contract drawings. On August 6, 1986, the ROICC again reversed himself and issued a revised PCO No. 4, requesting a cost proposal for providing concrete slabs in the gas station area. Plaintiff submitted his proposal on August 8, 1986, but received no response until October 30, 1986, when the ROICC

---

9. The use of asphalt in a gasoline dispensing area would violate state safety regulations, in that gasoline, when it contacts asphalt, leads to a deterioration of the asphalt. Any subsequent spillage of gasoline would then penetrate the asphalt and contaminate the underlying soil, thereby necessitating expensive cleanup operations.

issued an authority to proceed with installation of concrete slabs.

The contract plans called for sloped grading of the surface in the gas station area. Plaintiff informed the ROICC in mid-June of 1986 that this situation was unusual and asked if it should be changed. The ROICC responded negatively at first. However, in a confirmation of a telephone conversation occurring on July 21, 1986, Lt. Fredette wrote: "[W]ork associated with the fuel dispensing islands was directed to be stopped in order to allow the ROICC to issue a revised grading plan for the fuel dispensing area. We acknowledge the formwork for the islands is complete and the concrete pour for this item is being delayed." On August 6, 1986, the ROICC in revised PCO No. 4 requested a price proposal for regrading the fuel dispensing area.

On June 17 or 18, 1986, the Marines purposefully released large amounts of water from their fire hydrant system, which flooded part of the building site. This flood caused the excavation surrounding the newly installed gas tanks to cave in, possibly damaging the gas tanks themselves. According to plaintiff, if the weather cooperated, it would take about two weeks for the excavation to dry out. Only then could plaintiff inspect the tanks to see if shifting debris or rocks caused any damage.

In a letter dated July 3, 1986, the ROICC sent plaintiff PCO No. 16 requesting a cost proposal for removing debris from the excavation. On July 9 and 10, 1986, the Marines again flooded the excavation site. Plaintiff claimed on July 29, 1986, that this problem with the tanks was delaying other aspects of the gas station portion of the project. On August 6, 1986, the ROICC forwarded to plaintiff drawings for the revised gradings for the gas station area. A few days later, plaintiff commenced work on the gas tank excavation. On October 30, 1986, the ROICC issued a unilateral change order giving plaintiff the authority to proceed with the excavation of the gas tanks.

The Marines flooded the site yet again on or about November 24, 1986, which caused a water line to burst and discharge additional water into the area. This flooding caused the gas island work to be delayed. On November 26, 1986, the ROICC issued another request for a price proposal for additional clean-up and excavation work. Plaintiff submitted his price on December 2, 1986, and received the ROICC's acceptance ten days later. Once again, around December 13 and 14 the site flooded. This time the area adjacent to the gas tanks washed away, causing delay in plaintiff's installation of concrete curbs and gutters. Water was still running on the site until December 23, 1986, which prevented any refill or repair work.

The ROICC decided on July 11, 1986, to have recessed air and water distribution boxes installed in the concrete curb, which runs along the perimeter of the slab. The original contract specifications did not include these boxes. Due to the necessity to run the pipes for these boxes underneath the concrete slabs, the pouring of the slab and curb was delayed until plaintiff received details concerning the location and elevation of the boxes. The ROICC provided these details on August 4, 1986. Due to the various floods, rain, and other delays mentioned above, the curb work was not commenced until January 19, 1987. The work was completed on about January 30 of the same year.

Concerning these areas which directly impacted the critical path, defendant groups these areas of delay together and assigns net responsibility to both plaintiff and NAVFAC. Specifically, Mr. Freas stated:

> [W]hat actually happens is [that] the contractor performs the work over an enormous amount of delay that occurs here, some 43 workdays in total, but manages to complete the work quicker than scheduled. It was some, I believe, 30 workdays in the schedule for this work to be performed.
>
> The contractor performs it in a total of ... [roughly] 13 to 14 workdays....

So in essence, ... [plaintiff] is mitigating delay here and therefore in terms of his delay and the delay caused by the owner, I net that down to 27 workdays in total of which the contractor being responsible for seven and the Government being responsible for 20 workdays.

....

[This calculation of delay] was a balancing of credit for.... [plaintiff's] ability to perform the work under what I could describe as an accelerated basis or mitigating further delay.... [Plaintiff] really made an effort there to get that work done.

And so therefore I didn't give ... [plaintiff] all the time that he may have ... measured along this [critical] path. I [attributed] the bulk of the delay to the Government."

5. *Installation of refrigerator boxes*

NAVFAC was responsible for the supply and installation of "refrigerator boxes" [10] in three large openings in the west wall of the building. This work was not plaintiff's responsibility under the contract. The installation of the boxes created a weather-tight building that allowed plaintiff to perform necessary work in the building's interior such as installation of floor tile and testing of the HVAC system.

Plaintiff first requested installation of the boxes during the first week of December 1986. The ROICC responded by stating that it planned to install the three boxes on January 27, 1987. Although installation actually began on February 2, 1987, the work was finished by February 5, 1987, enabling plaintiff to perform the remaining work on the building's interior. Plaintiff claims 62 days of delay for late delivery and installation of the refrigerator boxes.[11]

Defendant views the installation of the refrigerator boxes as a non-critical item and therefore contends that any delay in installation is immaterial. The critical path

was in the site work, according to Mr. Freas, when the refrigerator boxes arrived. The witness, however, did acknowledge that some delay resulted from the late delivery of these boxes.

On January 23, 1990, the ROICC sent APL a letter stating, in part: "Please be advised that after reviewing the contract documents this office has concluded the design was deficient and there is potential A/E liability exceeding $50,000."

On October 21, 1986, plaintiff then sent his claim to Assistant ROICC Debra Marie Chinn, who had replaced Lt. Freas. He forwarded an amendment to this claim on June 16, 1987. In Final Decision 61–68 dated August 9, 1988, Contracting Officer William N. Lindstrom, the head of the Contract Terminations and Claims Branch of NAVFAC's San Bruno, California office, allowed recovery for delays concerning the re-design of the roof, flooding by the Marines, and another item which is not at issue in this litigation. Plaintiff filed suit in the Claims Court on July 24, 1989.

## DISCUSSION

The court must first assign responsibility for and determine the duration of the delays that took place in constructing the Location Exchange. The court will next determine the critical path in order to assess the compensability of these delays. Finally, the court will evaluate plaintiff's proof of damages.

■ Two points must be made preliminarily that guide the discussion of facts and law. First, the court has taken into account the testimony of all witnesses in preparing its findings and conclusions, although some testimony need not be particularized. Testifying for plaintiff, James Michael Kilgore, who was responsible for estimating and preparing shop drawings for doors and sills on the project for San Diego Precast Concrete Co., added little to

---

**10.** Refrigerator boxes are boxes that encircle the actual refrigerators installed in the Location Exchange.

**11.** Plaintiff's complaint claimed only 52 days of delay. At trial, counsel for plaintiff made an oral motion to amend the complaint to reflect 62 days of delay. Because defendant suffered no prejudice from this late amendment, the court granted the oral motion.

Mr. Wilner's testimony. For defendant Mr. Fredette (formerly Lt.) and Ms. Chinn did not offer pointed testimony on the subject in dispute. Basically, they charted the course of the relationship between plaintiff and the ROICC. James Le Neve, the President of APL, who also testified for defendant, failed to qualify as an expert and did not testify persuasively as to any material issue. Second, the court allowed into evidence over plaintiff's objection a critical path analysis prepared by Mr. Freas and made available to plaintiff in its final form in segments—the first two days before the trial and the second during trial. The court grounded its ruling on Fed.R.Evid. 403, which allows introduction of evidence if the probative value substantially outweighs the danger of unfair prejudice. Simply rendered, the basis for the ruling was that plaintiff's case would have been incomprehensible without defendant's exhibit.

### 1. *Responsibility for and duration of delays*

#### a. Hollow metal doors and frames and finished hardware

■ Plaintiff asserts that he sustained 46 days of delay due to unclear government specifications concerning the hardware and dimensions for the hollow metal doors and frames. Defendant's rejoinder was twofold. First, it stated that plaintiff would have had to wait longer for the sills before he could have completed his masonry if the doors and frames had arrived earlier. Second, defendant claimed that such delay was not on the critical path. Whether or not the delay was critical, however, is immaterial to determining whether or not any delay occurred.

Defendant's first argument devolves to the position that plaintiff may not recover twice for concurrent government delay. The court agrees and would not award plaintiff "double" damages if the two periods of delay, in fact, do overlap. However, delay resulting from improper specifications of doors and frames is more properly assigned to doors and frames rather than to precast sills.

With the pouring of the stem walls on October 23, 1985, the building was ready to accept the hollow metal doors and frames on the October 24. The doors and frames did not arrive on site until December 6, 1985. Since plaintiff proved by a preponderance of the evidence that NAVFAC caused this delay in delivery, plaintiff has established 43 calendar days of NAVFAC delay for this item.

#### b. Precast concrete

■ Both parties agree that the delay resulting from late delivery of the precast concrete began on January 9, 1986. Defendant claims that this delay ended on March 21, 1986, with the delivery of the sills. Plaintiff contends the delay ended three days later on Monday the 24 when installation of the sills began. The court finds that the delay ended when the sills arrived; any delay arising between delivery and installation is the responsibility of plaintiff, not NAVFAC. Accordingly, the court finds that the delay attributable to late delivery of the precast concrete lasted until March 21, 1986. This period covers 71 calendar days of delay.

■ Defendant, through the testimony of Mr. Freas, asserts that plaintiff is responsible for an additional 13 workdays of delay due to tardy preparation for and installation of the precast sills. Since plaintiff makes no corresponding claim for delay on these dates, between December 12 and 31, 1985, and March 30 and April 10, 1986, defendant's proof on point is of no moment. Further, even if plaintiff had claimed government delay for that time frame, Mr. Freas' conclusory testimony on point was not persuasive.

Concerning responsibility for the late delivery of the precast sills and lintels, the presentation of each party can be faulted. Characteristic of his testimony on all issues, plaintiff's presentation meandered; his responses to questions often lacked focus. Although plaintiff made many statements and referred to numerous documents throughout his direct examination, the impact of his testimony was confusion rather than certainty. As with most of plaintiff's case, the court had to shape the

pieces of the factual puzzle into a coherent pattern in order to make a meaningful analysis possible.

As for defendant's presentation, Mr. Freas made the following statement:

That source of delay is a late fabrication on the part of the contractor and it comes from my review of the records and reading all the documentation and taking into account the arrival of the submittals, the timeliness of the submission of the submittals, the contractor's representation of the then amount of time that was necessary to produce the pre-cast, knowing that there were necessary submittal reviews and what not. And that all spun it into what I represent here as a contractor delay.

Characteristic of his testimony on all issues other than the route of the critical path, Mr. Freas' testimony is conclusory. Mr. Wilner's testimony was more particularized.

The court, then, must chose between a muddled presentation by plaintiff and a conclusory presentation by defendant. Plaintiff's was the more credible presentation; he succeeded in establishing liability, to the extent found, by a preponderance of the evidence. The testimony and exhibits documented numerous late responses from the ROICC's office to submittals made by plaintiff. As but one example, plaintiff did not receive Lt. Fredette's response to hardware submittal No. 15, dated August 21, 1985, until 43 days later on October 3, 1985. This inaction on the part of the ROICC persuades the court that untimely responses from the ROICC, rather than untimely presentation of submittals by plaintiff, caused the late delivery of the precast sills. Accordingly, NAVFAC is responsible for the resulting 71 calendar days of delay.

c. Roofing: structural steel and design

■ With regard to structural steel, plaintiff claims that NAVFAC is responsible for nine calendar days of delay running from June 6, 1986, to June 15, 1986, due to the redesign of the steel so that it would be capable of supporting the HVAC unit. Defendant places responsibility upon plaintiff for 34 workdays of delay from May 2 to June 18, 1986, resulting from both the misalignment and faulty installation of bolts. Mr. Freas considered the redesign issue immaterial because it was concurrent with the larger period of contractor delay.

*Klingensmith, Inc. v. United States,* 731 F.2d 805 (Fed.Cir.1984), stands for the proposition that a contractor may recover for concurrent, but apportioned, delay if it can prove the expenses assumed by each party. 731 F.2d at 809. Plaintiff met this burden. Even assuming that the alignment of the holes and the installation of the steel were delays attributable to plaintiff, the incapacity of the steel to support the weight of a HVAC unit was attributable to NAVFAC. The record fails to support a finding that plaintiff somehow caused the insufficiency in the strength of the structural steel. Having apportioned his delay separate from that of NAVFAC, plaintiff established his entitlement to recover for nine calendar days of delay.

■ Regarding errors in the design of the roof itself, plaintiff claims 99 calendar days of delay, from June 26, 1986, to October 7, 1986. For this same item, Mr. Freas attributed 62 workdays of delay to NAVFAC running from June 26, 1986, to September 22, 1986. The witness also stated that plaintiff's failure to mobilize the roofing subcontractor in a timely manner delayed the completion of the project from September 27 to October 7, 1986, a period of eleven workdays.

The court agrees with both parties that NAVFAC caused delay to the project from June 26 to September 22, 1986. Plaintiff could have begun installation of the roof on June 26, 1986; however, he did not receive the corrected design with the proper elevations until August 8, 1986. ROICC Chinn also increased the size of the drain pans on August 28, 1986. The correct pans did not arrive on site until September 15, 1986. This period of delay continued until September 22, 1986, a period totalling 87 calendar days.

■ The next time frame in dispute runs from September 27, 1986, until October 7,

1986. In Mr. Freas' opinion, plaintiff failed to mobilize promptly his roofing subcontractor to ensure timely installation of the roof. After noting that plaintiff used factory-made tapered insulation, the witness stated:

> But there was mention in the correspondence that in August ... [plaintiff] mentions that he had proceeded based on that authority after receipt of the plans, the revised plans, in early August and that based on my knowledge and discussion with others that are specifically in the roofing industry, that the amount of time that took place between the August time frame and September when the roof drain work was finally installed in order for things to go forward, ... there was sufficient time for a factory tapered system to be manufactured and brought out on site.

Mr. Freas admitted on cross-examination that his analysis of roofing delay was based on the knowledge of national roofing subcontractors, not southern California contractors in 1986. However, this concession does not undercut his testimony.

Plaintiff has not proved by a preponderance of the evidence his entitlement to damages for eleven calendar days of delay running from September 27 to October 7, 1986. Based on Mr. Freas' testimony, on plaintiff's receipt of the revised roofing plans in the end of August, and on plaintiff's failure to allege how long fabrication of the roof would take, plaintiff failed to prove that the roof could not have been delivered to the site by September 27, 1986. Therefore, plaintiff cannot recover for this eleven-day delay period.

#### d. Site work

 In closing argument counsel for plaintiff, for the first time in the record that the court is aware, stated that "[p]laintiff does not contend and has never contended that the critical path of the project goes to the site.... the critical path of the project always went through the building." The court agrees that the critical path remained in the building at all times, except for some early site work which ended some ten days into construction. Accordingly, plaintiff may not recover for the 52 calendar days of delay that he claims with regard to the site work. *Broome Constr. v. United States*, 203 Ct.Cl. 521, 528, 492 F.2d 829, 833 (1974). However, since these delays do influence the court's view of the critical path, they will be discussed below.

#### e. Installation of refrigerator boxes

 Plaintiff claims 62 calendar days' delay from first week of December 1986, to February 5, 1987. Mr. Freas did acknowledge some delay resulting from the late delivery of the refrigerator boxes. Because he considered the delay non-critical, he did not assign a precise number of days of delay to this item.

Although plaintiff claims delay from the first day on which he requested installation of the boxes, such a claim is unrealistic. Plaintiff both fails to account for installation time, as well as to allege a date on which he could have begun the interior work but for the late delivery. Accordingly, plaintiff did not prove delay amounting to 62 calendar days.

The first work week of December 1986 ended on Friday, December 5. Actual installation lasted from February 2 to February 5, 1987. Assuming, then, that NAVFAC could have begun installation on Tuesday, December 9, installation could have progressed sufficiently through Friday, December 12 so as to allow plaintiff to begin the interior work by Monday, December 15, 1986. Since defendant did not contest this claim of delay, but argued that the delay was non-critical, the court finds that NAVFAC caused 52 calendar days of delay due to its late installation of the refrigerator boxes, a period from December 15, 1986, to February 5, 1987.

### 2. *The critical path*

 Plaintiff's position, as stated by counsel in closing argument, is that the critical path was always in the building. Plaintiff, however, failed to diagram these delay episodes or otherwise to depict the precise route of the path. Plaintiff thoroughly described each item of delay, but did not present evidence concerning an

overall view of the critical path that he sponsored. Undoubtedly, plaintiff does have a position regarding the proper course of the critical path. Unfortunately, he failed to supply a critical path analysis, and the court is not obligated to attempt to construct one for him. Due to the absence of plaintiff's view of the critical path, the court cannot assign weight to any concept of the critical path as propounded by plaintiff.

 Defendant's view of the critical path, expressed through the testimony of Mr. Freas, is comprehensive and detailed. Specifically, defendant contends that the critical path takes the following route: On August 5, 1985, the critical path began with preliminary site work and then quickly shifted to the building on August 16, 1985. While in the building, the path progressed through the footings for the stem walls from August 16 until September 19, to the stem walls from September 20 until October 29, to the slab from October 30 until December 9, to the masonry from December 10 until April 24, 1986, to the structural steel from April 24 until June 26, and to the roofing from June 27 until October 17, 1986.

At that time Mr. Freas testified that the critical path shifted back into the site work. The reasoning behind this shift in the critical path was twofold: First, by October 17, 1986, the amount of cumulative delay in the site work equalled the amount of cumulative delay to the building; and second, after October 17, the critical delay in the site work exceeded the critical delay in the building.

Once in the site work again, the critical path progressed through the gas islands from October 18 until November 6, to the curbs and gutters from November 7 until January 26, 1987, to landscape work from January 27 until February 10, to pavement from February 11 to March 11, and to issuance of a gasoline station Air Pollution

Control District ("APCD") permit from roughly March 12 to April 1, 1986.[12]

The court accepts Mr. Freas' depiction of the critical path as accurate, except for two items. The first involves the witness' placing the slab work on the critical path from October 30 until December 9, 1986. Concerning this topic, the following exchange between Mr. Freas and defense counsel took place on direct examination:

Q. [C]an you explain to us why it is that you have the slab pour intervening between the completion of the stem walls and the start of the masonry set-up along your critical path?

A. I have that for two reasons. One, that's what was delineated in the contractor's [October 4, 1985] schedule, ... and number two, I could find no evidence in the record which led me to find that the contractor was attempting to resequence that activity and to notify the Navy that that work was then going to be revised.

. . . .

Q. Based on your experience as a construction scheduling analyst, can you tell me whether you think in your opinion it would make sense to proceed directly from the pouring of the stem walls to the construction of the masonry?

. . . .

A. In my opinion, in this particular case ..., to sequence the work in a way that you would pour the stem walls and then ... move the work to the masonry block walls would be unnecessary and create a burden upon yourself in that you would then have to work inside the building on the slab and the various elements that would need to be performed for the slab with this now almost like erecting a fence around where you have to go in and out to do the work.

It's not impossible but I see it as something that's just unnecessary for a project of this type....

---

**12.** Since the disputed delay regarding the responsibility for obtaining the APCD permit occurred after plaintiff's alleged completion date of the project, plaintiff agreed to not contest this point. Defense counsel likewise presented no meaningful evidence or testimony concerning the permit.

On cross examination plaintiff's counsel elicited the following testimony from Mr. Freas:

Q. Sir, what item of work on the building was dependent upon the completion of the concrete slabs?

A. Well, off the top of my head, the first item that comes to mind would be interior wall framing....

....

Q. Sir, we're talking, aren't we, between the completion of the slab here on December—it appears to be on December 9, and the framing ... in July of 1986, there's a period of time of about seven months there, isn't there?

....

A. Let's see.... About that much.

Q. Sir, what was it about the masonry in your opinion that was absolutely dependent upon the slab being poured, on the day that you say it was on the critical path?

A. Is your question to me the dependency of having a slab floor completed in order to set masonry?

Q. Yes....

A. The contract documents would not specifically preclude that work, to my knowledge. You could actually build block walls and leave out the slab work.

The court finds that placing the slab on the construction schedule immediately after pouring the stem walls was not critical, although it may have been convenient. Plaintiff testified that, although, as originally planned, the slab was to be poured before the stem walls were built, he reversed the order in order to make up for lost time. This explanation offered by plaintiff is reasonable and was not refuted persuasively by defendant.

The next item of construction dependent upon completion of the slab was the erection of the interior walls, which did not begin until July 11, 1986. Neither party argued that the interior walls were a critical path item. Accordingly, the court concludes that the critical path progressed through the stem walls from September 20 until October 23, 1985, to the hollow metal doors and frames from October 24 until December 9, 1985 and then to the masonry on December 10, 1985.

The second item where the court does not accept Mr. Freas' depiction of the critical path is the shift to site work on October 17, 1986. The court asked the witness the following question on point:

Q. If the delay after October 17, [in] the building would have exceed the delay on the site, would the critical path have remained in the building?

A. Yes, ma'am.

Because Mr. Freas did not consider the refrigerator boxes a critical item, he did not compute the precise number of days by which the late installation of these boxes delayed laying the floor tile and testing of the HVAC system. However, he did acknowledge that some delay occurred.

The court has found that NAVFAC caused a delay totalling 51 calendar days from December 15, 1986, to February 5, 1987, due to the late delivery and installation of the boxes. Mr. Freas testified that, between October 17, 1986, and February 5, 1987, the site work took on 43 days of delay. Therefore, from October 17, 1986, until February 5, 1987, the amount of delay in the building exceeded the amount of delay in the site work. Accordingly, the critical path remained in the building until February 5, 1987. With the completion of the work on the building on February 11, 1987, only then did the critical path shift to the site work.

The existence of concurrent delay in both the building and site work does not preclude recovery by a contractor. *See Klingensmith*, 731 F.2d at 809 (recovery allowed for concurrent delay on critical path). As stated in *Fortec Constructors v. United States*, 8 Cl.Ct. 490, 502 (1985), "[t]his Court ... does not believe that the ... [Government] can validly assert that the contractor is precluded from entitlement to an extension of time for one change merely because ... [the contractor] is concurrently being delayed on other changes for which ... [the Government] is also responsible and is also denying extensions of time."

Plaintiff demonstrated his entitlement to recover for the following calendar days of delay along the critical path caused by NAVFAC: 1) 43 days, from October 24 until December 6, 1985, regarding the hollow metal doors and frames; 2) 71 days, from January 9 to March 21, 1986, regarding the precast sills; 3) nine days, from June 6 until June 15, 1986, regarding structural steel; 4) 87 days, from June 26 until September 22, 1986, regarding redesign of the roof; and 5) 52 days, from December 15, 1986, until February 5, 1987, regarding installation of the refrigerator boxes. These five items of delay total 262 calendar days.[13]

### 3. Damages

In a suit to recover damages, " '[t]he claimant bears the burden of proving the fact of loss with certainty, as well as ... the amount of loss with sufficient certainty so that the determination of the amount of damages will be more than mere speculation....' " *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 767 (Fed.Cir.1987) (quoting *Willems Indus., Inc. v. United States*, 155 Ct.Cl. 360, 376, 295 F.2d 822, 831 (1961), *cert. denied*, 370 U.S. 903, 82 S.Ct. 1249, 8 L.Ed.2d 400 (1962)). However, once a party adequately demonstrates the existence of damages, it need not quantify their exactness to a mathematical certainty. *Lindemann Maschinenfabrik v. American Hoist*, 895 F.2d 1403, 1406 (Fed.Cir.1990) (citing *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931)); *Capital Elec. Co. v. United States*, 729 F.2d 743, 746 (Fed. Cir.1984) (citing *Story Parchment*). Plaintiff has established liability on the part of NAVFAC. Only if plaintiff makes a *prima facie* showing of damages need defendant rebut the evidence with its own proof. *Lisbon*, 828 F.2d at 767. In such a situation, "defendant bears a substantial burden of proving that the costs claimed for an equitable adjustment are not reasonable...." *Neal & Co. v. United States*, 19 Cl.Ct. 463, 470 (1990) (citing cases).

Plaintiff presented his case on damages largely through the testimony of Robert Troy Fichtelman. Since 1986, the witness has been a self-employed consultant analyzing costs for construction and military contracts. Mr. Fichtelman's analysis was presented in PX 529; his testimony centered on explaining this exhibit.

Mr. Fichtelman concluded that plaintiff's damages total $304,737.00. The witness calculated this total by adding: $67,096.00 for field labor costs; $73,934.00 for extended home office overhead; $106,650.00 for direct administrative expenses; $10,544.00 for Prompt Payment Act interest; and $12,843.00 for subcontractor costs. From the subtotal of $271,067.00, he subtracted $32,524.00 as credits for change orders, yielding $238,543.00. Mr. Fichtelman next added: $24,257.00 for profit on costs at 13 percent; $1,567.00 for bond expenses at 6 percent; and $40,360.00 for retention and liquidated damages to arrive at damages of $304,737.00. This last figure is incorrect and should equal $304,727.00. The court examines each amount in turn.

#### a. Field labor costs

Mr. Fichtelman testified that this item of damages reflects the extra hours worked by plaintiff's superintendent on the project, Robert Nabet, as evidenced in the certified payroll records. Mr. Nabet was a full-time hourly employee at all times relevant to this proceeding. Mr. Fichtelman inspected the payroll records to determine that Mr. Nabet worked 1,474 extra hours due to delay caused by NAVFAC. The witness next ascertained Mr. Nabet's hourly rate by adding the hourly rate provided for in the contract to certain "fringe rates" provided for in a Defense Contract Audit Agency ("DCAA") audit of plaintiff's home and field office overhead. The resulting $45.52 per hour represented Mr. Nabet's "fully burdened" labor rate. He then multiplied 1,474 hours by $45.52 per hour for the total field labor costs of $67,096.00.

Although the court agrees with the methodology used by Mr. Fichtelman, the

---

**13.** Plaintiff testified regarding 341 total calendar days of delay. However, in his opening statement, counsel stated that plaintiff was claiming only 286 calendar days of delay.

court cannot accept the number of extra hours worked. The witness obtained the 1,474 total from plaintiff's payroll records. Plaintiff also informed Mr. Fichtelman of the periods of delay that were being claimed, and Mr. Fichtelman simply combined all the hours worked by Mr. Nabet during those periods. The court has found that plaintiff proved 262 of the 341, or 76.8 percent, of the days of delay that he claimed. Additionally, Mr. Fichtelman included 64 hours of delay for work performed between April 5, 1986, and April 14, 1986. The court is unable to discern the basis for this claim of 64 hours in the record. This 64 hours correlates to 4.3 percent of the total 1,474 hours claimed.

 The court has reduced by 25 percent the number of hours claimed for work by Mr. Nabet. When a contractor's methodology for proving damages is sound, but the trial reveals a problem with the application of the methodology because some of the data is faulty (for example, hours, dollars, personnel, material, or impact of related claims), disallowing recovery for the entire item is draconian and uncalled for by controlling precedent. Rather, the court should adjust the claim to take account of the nature, scope, and impact of the problem. *See Servidone Constr. Corp. v. United States,* 19 Cl.Ct. 346, 384–85 (1990) (rejecting contractor's proffer of its bid, court calculated reasonable bid amount as a predicate for allowing equitable adjustment for differing site condition), *aff'd,* 931 F.2d 860 (Fed.Cir.1991); *Skip Kirchdorfer, Inc. v. United States,* 14 Cl.Ct. 594, 612–13 (1988) (reducing an item of damage claimed by plaintiff by 10 percent to account for problems with damages analysis).

After adjustment by the 25–percent factor, the hours worked by Mr. Nabet are 1,106. When mulitplied by $45.52, plaintiff's recovery for field labor cost totals $50,345.00.[14] Such costs are allowable pursuant to Federal Acquisition Regulation ("FAR") § 31.205, 48 C.F.R. § 31.205–6(a) (1990).

b. Extended home office overhead

 Mr. Fichtelman concluded that plaintiff was entitled to recover $73,934.00 for extended home office overhead. *See Capital Elec.,* 729 F.2d 743 (damages for extended overhead recoverable). His testimony on point was minimal, so his exhibit provides the evidence for this claim.

As derived from PX 529, Mr. Fichtelman arrived at a daily overhead rate for years 1986 and 1987 by dividing the adjusted home office expenses for each year by 365. The witness calculated the adjusted home office expenses by subtracting any unallowable costs from the gross home office expenses. The gross home office expenses included, in part, the full amount of expenses for "Officer Salary," which is the salary of plaintiff himself: No testimony or evidence suggests what other items comprised home office expenses, perhaps because the DCAA accepted this category with certain adjustments.

Schedule 1 of PX 529 purports to explain the process by which Mr. Fichtelman arrived at an hourly wage for plaintiff. First, Schedule 1 represents that Mr. Nabet worked 2,080 hours in one year. Mr. Fichtelman then multiplied that figure by $45.52 to arrive at an "Annual Salary" of $94,682.00. Next, the witness noted that plaintiff, as the "Officer," earned salaries of $157,267.00 and $113,215.00 for fiscal years 1986 and 1987, respectively. Mr. Fichtelman then divided each of these salaries by 2,080 to arrive at a per-hour wage for plaintiff of $76.00 and $54.00 for years 1986 and 1987, respectively. Schedule 1 concludes: "This comparison demonstrates that the compensation actually paid to the Officer is not unreasonable in light of what the mandatory wage rate is for a superintendent [Mr. Nabet]."

Mr. Fichtelman selected the lower $54.00 amount as the one by which he would calculate plaintiff's hourly rate. The court considers this $54.00 figure reasonable, especially in light of the fact that Mr. Nabet's

14. Consistent with the approach of Mr. Fichtelman, the court rounded all damage totals to the nearest dollar.

fully burdened labor rate equalled roughly $45.00 an hour.

Applying this process, Mr. Fichtelman calculated in PX 529 that home office expenses totalled $272,899.00 in fiscal year 1986. From this he subtracted $47,704.00 in DCAA adjustments for unallowable costs and arrived at adjusted home office expenses of $225,195.00. Dividing this figure by 365, Mr. Fichtelman derived $626.00 as the daily rate of overhead for 1986. This $626.00 figure is incorrect and should be $617.00. For fiscal year 1987, home office expenses totalled $163,960.00. Mr. Fichtelman subtracted $61,491.00 in unallowable costs to arrive at adjusted home office expenses of $102,469.00, a daily rate of overhead for 1987 of $281.00.

Mr. Fichtelman then noted that plaintiff only performed 44.1 percent of the company's work for the 1986–1987 period on the contract at issue in this suit. The witness next calculated extended overhead based on plaintiff's realizing 253 days of government-caused delay in 1986 and 33 days of delay in 1987. The court has found that plaintiff realized 226 days of delay in 1986 and 36 days of delay in 1987. Accordingly, for 1986, plaintiff will recover damages for extended home office overhead arrived at by multiplying 226 days by 44.1 percent of the $617.00 daily overhead rate. This calculation produces damages for 1986 of $61,494.00. For 1987 the damages are arrived at by multiplying 36 days by 44.1 percent of the $281.00 daily overhead rate. This calculation produces damages for 1987 of $4,461.00. Damages for extended home office overhead over the two-year period total $65,955.00.

c. Direct administrative expenses

■ Plaintiff claims $106,650.00 for direct administrative expenses, a claim encompassing two categories of plaintiff's own work, proposal preparation and contract administration from 1987 to 1989 and litigation support from 1988 to 1990. Mr. Fichtelman arrived at this figure by multiplying the number of hours worked by plaintiff by $54.00 per hour. When the court specifically inquired of Mr. Fichtelman if he had inspected any contemporaneous records, notes, or diaries in ascertaining the hours claimed, the witness responded, "No." Through heavy reliance on conversations with plaintiff, Mr. Fichtelman reconstructed these hours by learning what plaintiff did during this period and by identifying the hours during this period to this particular contract. In his post-trial brief on damages, plaintiff explained that "[w]hile *exact* figures for these hours are not available, it is clear from the Court's records that ... [plaintiff] was not aware of his rights to collect such claims until November, 1990 when Mr. Fichtelman was retained, ... and ... [plaintiff] gave estimates of these hours based upon his own personal experience and knowledge." Plf's Br., filed Feb. 25, 1991, at 9 (emphasis in original).

When the court asked Mr. Fichtelman how he determined the allowability of these claims, the witness responded:

[I]n all due candor and to be objective and reasonable, I understand that there are some gray areas between costs that are recoverable in the presentation and prosecution of claims of the Government. So I had to objectively try and determine what would be considered proposal preparation and contract administration versus what would be litigation support....

For the first category, proposal preparation and contract administration, Mr. Fichtelman used hours allegedly worked by plaintiff from 1987 to 1990. The witness testified that plaintiff accumulated these hours in making attempts to settle the contract administratively. Mr. Fichtelman, in PX 529, represents that plaintiff spent 300 hours in 1987, 450 hours in 1988, and 125 hours in 1989, for a total of 875 hours, working toward an administrative settlement. Concerning the second category, litigation support, the witness testified that this item covered hours worked by plaintiff assisting his attorney in preparing the case for litigation. Mr. Fichtelman listed 350 hours in 1988, 250 hours in 1989, and 500 hours in 1990, for a total of 1,100 hours. The witness then multiplied the 1,975 total hours by $54.00 per hour, to reach a total damage claim for direct administrative support expenses of $106,650.00.

Defendant disputes plaintiff's right to recover either item of damages, citing FAR

§ 31.205–33(d) for the general rule that "[c]osts of legal, accounting, and consultant services and directly associated costs incurred in connection with ... the prosecution of claims against the Government [citation omitted] are unallowable...." Plaintiff's claim for litigation support costs is not recoverable.

In *Singer Co. v. United States*, 215 Ct.Cl. 281, 568 F.2d 695 (1977), cited by defendant, Singer attempted to recover claim preparation costs by arguing that these costs were incidental to performance of the contract. The court denied recovery, holding that the "requests for equitable adjustment were not performance-related; they bore no beneficial nexus either to contract production or to contract administration. Accordingly, the [claim preparation costs] are not recoverable." 215 Ct.Cl. at 328, 568 F.2d at 721. The boards of contract appeals regularly reach the same result. *E.g., Coastal Dry Dock and Repair Corp.*, ASBCA No. 36754, 91–1 BCA (CCH) ¶ 23,324, 1990 WL 177496 (costs incurred pursuant to claim preparation unallowable); *Yadkin Inc.*, PSBCA No. 2051, 89–2 BCA (CCH) ¶ 21,709, 1989 WL 27910 (expenses incurred in documenting a claim unrecoverable). Plaintiff's claim for proposal preparation and contract administration must fail.

Plaintiff cites *Kaiser Aerospace & Electronics Corp.*, ASBCA No. 32098, 90–1 BCA (CCH) ¶ 22,489, 1989 WL 144974 for the proposition that administrative costs incurred in negotiations directly related to the contract are recoverable. *Singer*, which is binding precedent on this court, instructs otherwise. Moreover, *Kaiser* does not stand for the proposition cited. Accordingly, plaintiff's claim for administrative support expenses is unallowable.[15]

### d. Prompt Payment Act

Plaintiff claims the right to recover interest under the Prompt Payment Act, 31 U.S.C. §§ 3901–3907 (1988) (the "Act"), in the amount of $10,544.00, which accrued between September 18, 1987, and January 11, 1989, and between February 11, 1989, and December 17, 1990. Mr. Fichtelman sought to charge NAVFAC with interest for unpaid invoices. Plaintiff's position is that because NAVFAC unjustifiably withheld payment of invoices, interest under the Act accrues. Plaintiff also asserts that no overlap exists between his claim for CDA interest on damages resulting from delay and his claim for interest under the Act. Defendant opposed, stating that the Act is inapplicable to situations wherein, as here, a legitimate dispute concerning payments under the contract is present.

Section 3907 of the Act states the rule governing the recoverability of interest on a CDA claim:

> [T]his chapter does not require an interest penalty on a payment that is not made because of a dispute between the head of an agency and a business concern over the amount of payment or compliance with the contract. A claim relating to the dispute, and interest payable for the period during which the dispute is being resolved, is subject to the Contract Disputes Act....

The legislative history of the Act is even more explicit: "The Act's protections apply only when there is no dispute relating to a contractor's performance in accordance with the terms and conditions of the contract. If a dispute exists, a contractor is not entitled to payment or late payment interest penalties until the dispute is resolved." H.R.Rep. No. 784, 100th Cong., 2d Sess. 11, *reprinted in* 1988 U.S.Code Cong. & Admin.News 3036, 3039; *see Arkansas Best Freight Sys., Inc. v. United States*, 20 Cl.Ct. 776 (1990) (discussion of "dispute" under the Act).

The relevant inquiry, then, becomes whether a dispute existed between plaintiff and NAVFAC over an amount of payment. Plaintiff claims that he is due payment for work performed under the contract. Defendant disputes either its liability for and/or the amount demanded by plaintiff for each item of delay addressed at trial. The disparate views of the parties indicate

---

**15.** To the extent that Mr. Fichtelman relied on conversations with plaintiff as a source to determine the number of hours that plaintiff spent working toward an administrative or legal resolution of his claim, the court views the underlying hours as suspect. Without contemporaneous documentation to support the number of hours claimed, this item is speculative.

**262**

that a dispute exists over payment. Consequently, the court holds that the Prompt Payment Act is inapplicable.

### e. Subcontractor costs

■ Plaintiff, through Mr. Fichtelman, claims that he is entitled to recover for $12,843.00 in unreimbursed monies paid to his "subcontractors." However, at trial plaintiff introduced exhibits that reflect total "subcontractor" costs totaling only $12,786.00. These costs can be itemized, as follows: 1) $882.00 for preparing a new survey for the forced sewer main due to flooding by the Marines; 2) $1,671.00 for asphalt paving; 3) $80.00 for fabricating wooden doors; 4) $9,660.00 for retaining scaffolding on site while installing glass blocks; 5) $200.00 for fabricating hollow metal doors and frames; 6) $150.00 for preparing critical path and bar charts submitted with plaintiff's claim to the contracting officer; and 7) $143.00 for secretarial services used in claim preparation. The court finds that items 1, 2, 3, 6, and 7 are unallowable because each was either not on the critical path or incurred in claim preparation. Items 4 and 5 did result from government-caused delays. Plaintiff is entitled to recover $9,860.00 in damages.

### f. Recoverable costs

The court finds that plaintiff's recoverable costs are $50,345.00 for field labor expenses: $65,955.00 for extended home office overhead; and $9,860.00 for subcontractor costs. This subtotal is $126,160.00. To his corresponding figure, Mr. Fichtelman subtracted $32,524.00 for monies paid to plaintiff by NAVFAC pursuant to change orders. This court performs the same calculation and arrives at a subtotal of $93,636.00.

### g. Profit on costs

■ Lastly, plaintiff asserts entitlement to 13–percent profit on all contract work performed. Defendant disagrees, contending that in the absence of evidence of the parties' intent to the contrary, 13–percent profit is excessive.

In support of his claim, plaintiff relies on *Shank–Artukovich v. United States*, 13 Cl.Ct. 346 (1987), *aff'd mem.*, 848 F.2d 1245

(Fed.Cir 1988) (unpubl.), for the proposition that 13–percent profit is reasonable. In reaching its conclusion that plaintiff should recover 15 percent profit on costs, the court in *Shank* stated: "Mr. Shank testified that the project was bid at a profit level of 15 percent." *Id.* at 360. Plaintiff in this case gave no such testimony.

Plaintiff also relies on the guidelines set forth in the Armed Services Pricing Manual ("ASPM") which, according to Mr. Fichtelman, allows an 8–percent profit, plus an additional 5 percent if special factors are present.[16] The DCAA did not audit the 13–percent profit figure.

The court finds that plaintiff failed to demonstrate that he expected to make 13–percent profit on work performed. Using Mr. Fichtelman's testimony regarding the ASPM as a guideline, the court concludes that profit at a rate of 10 percent is reasonable for this contract. While plaintiff did encounter difficulties in his dealings with the ROICC, roughly 23 percent of the delays were caused by plaintiff.

■ Although not cited by either party, the contract's "Suspension of Work" clause, ¶ 17, states in pertinent part:

(b) If the performance of all or any part of the work is, for an unreasonable period of time, suspended, delayed, or interrupted by an act of the Contracting Officer ..., or by his failure to act ..., an adjustment shall be made for any increase in the cost of performance of this contract (*excluding profit*) necessarily caused by such unreasonable suspension, delay or interruption....

(Emphasis added.)

The court holds that the three items of costs recovered by plaintiff in this suit are costs resulting from unreasonable delay and, therefore, profit is not recoverable. *Maki v. United States*, 13 Cl.Ct. 779, 783 (1987) (construing an identical contract provision to preclude recovery of lost profits) (citing *Holloway Constr. Co. v. United States*, 4 Cl.Ct. 779, 789 (1984)), *aff'd mem.*, 852 F.2d 1293 (Fed.Cir.) (unpubl.), *cert. denied*, 488 U.S. 943, 109 S.Ct. 368, 102 L.Ed.2d 358 (1988). The field labor

**16.** The ASPM was not entered into evidence.

costs pertain to extra hours worked by Mr. Nabet due to government-caused delay; without the delay, these hours would not have been worked. Plaintiff does not claim profit on extended overhead. The subcontractor costs, as well, arose due to delay. Plaintiff, when asked why the scaffolding costs were incurred, responded: "Because of the delays we are claiming the Government caused." Plaintiff may not recover profit on any of these three items of cost.

Thus, the subtotal for damages at this point is $93,636.00. To his corresponding amount, Mr. Fichtelman added bond expenses of 0.6 percent. Bond expenses thus yield $562.00 and are allowable pursuant to FAR § 31.205–4(b); added to the subtotal, the amount totals $94,198.00.

h. Retention and liquidated damages

In addition, Mr. Fichtelman testified that plaintiff also should recover $40,-360.00 for "retention and liquidated damages." However, in its motion for reconsideration, counsel for plaintiff acknowledged that plaintiff failed to refer to liquidated damages in either its claim letter or in its complaint. Proceedings on reconsideration further revealed that the actual sum probably is $39,764.00. Section 605(a) of the CDA requires that "[a]ll claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision...." Nor was NAVFAC's claim for liquidated damages made the subject of a decision in writing by the contracting officer. Section 605(a) also requires that "[a]ll claims by the government against a contractor relating to a contract shall be the subject of a decision by the contracting officer...." The Claims Court therefore lacks jurisdiction over plaintiff's claim for liquidated damages or plaintiff's challenge to NAVFAC's claim for liquidated damages. *Dawco Constr., Inc. v. United States,* 930 F.2d 872, 877 (Fed.Cir.1991) (requirements of CDA are mandatory and are jurisdictional prerequisites) (citing *W.M. Schlosser Co. v. United States,* 705 F.2d 1336, 1339 (Fed.Cir.1983)).

17. The court requested that defense counsel supply the date on which the contracting officer received the claim letter. Defendant was unable to identify the date. Therefore, the court

**CONCLUSION**

Based on the foregoing, plaintiff shall recover an equitable adjustment in the amount of $94,198.00, with interest pursuant to 41 U.S.C. § 611 from October 27, 1986, the date on which the contracting officer received plaintiff's claim letter of October 21, 1986.[17]

IT IS SO ORDERED.

No costs.

has adopted a date representing the first business day after five calendar days from October 21, 1986, or Monday, October 27, 1986.