Melvin WILNER, d/b/a Wilner
Construction Company,
Plaintiff,

v.

The UNITED STATES, Defendant.

No. 595–89C.

United States Claims Court.

May 14, 1992.

Matthew R. Rutherford, San Diego, Cal., for plaintiff.

Brad Fagg, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant.

## OPINION

NETTESHEIM, Judge.

This construction contract case is before the court after trial on the merits. Melvin Wilner, d/b/a Wilner Construction Company ("plaintiff"), seeks recovery for alleged government-caused delay on the critical path of a construction project. Plaintiff contends that the Government delayed work relating to duct revisions, open web joist ("OWJ") revisions, and smoke detectors while these activities were on the critical path.[1] This opinion resolves the

---

1. Plaintiff also claims damages for delay relating to the completion date of the project. However, plaintiff did not submit a claim for this asserted delay to the contracting officer. The

court is without jurisdiction to consider this claim since the Contract Disputes Act, 41 U.S.C. § 605(a) (1988), requires that "[a]ll claims by a contractor against the government relating to a

issue of whether delays attributable to the Government occurred along the project's critical path and, if so, whether delay damages are owed to plaintiff. At the conclusion of trial, the court ruled from the bench on three other minor claims.

## BACKGROUND

On September 16, 1985, the United States Department of the Navy (the "Navy") awarded Contract No. N62474–83–C–2280 to Wilner Construction Company. The contract, for construction of an Operational Trainer Facility at Camp Pendleton, California, called for a completion date of October 1, 1986. The Navy accepted the project as complete on December 22, 1987, 447 days after the original completion date specified in the contract.

General Provision 17 of plaintiff's contract, a standard provision prescribed by the General Services Administration for government contracts, provides that a contractor shall be compensated for the costs associated with unreasonable delay that is the fault of the contracting officer. Thus, to recover delay damages plaintiff must establish that the Navy was responsible for unreasonable delay and that plaintiff incurred increased costs in performing the project as a result of that delay. Plaintiff contends that increased costs resulted from government-caused delay along the critical path of the project. One day of delay along the critical path of a project causes the completion date of a project to be extended one day. A delay relating to a specific activity on the project that does not affect the contract completion date is not a critical path delay. While non-critical path delay is compensable under General Provision 17, provided it is unreasonable and a contractor proves damages from such delay, *Avedon Corp. v. United States*, 15 Cl.Ct. 648, 652–53 (1988) (citing *Chaney*

contract shall be in writing and shall be submitted to the contracting officer for a decision. . . ." *Dawco Constr., Inc. v. United States*, 930 F.2d 872, 877 (Fed.Cir.1991) (requirements of CDA are mandatory and are jurisdictional prerequisites) (citing *W.M. Schlosser Co. v. United States*, 705 F.2d 1336, 1338–39 (Fed.Cir. 1983)).

*and James Constr. Co. v. United States*, 190 Ct.Cl. 699, 706–08, 421 F.2d 728, 732–33 (1970)), this opinion deals solely with critical path delay, since plaintiff's claimed damages are based on delay occurring along the critical path of the project and resulting in extension of the contract completion date due to government-caused delay.

In an earlier case involving plaintiff, *Wilner v. United States*, 23 Cl.Ct. 241 (1991), the court set forth what is entailed in critical path analysis:

"[T]he critical path method is an efficient way of organizing and scheduling a complex project which consists of numerous interrelated separate small projects. Each subproject is identified and classified as to the duration and precedence of the work. (*E.g.*, one could not carpet an area until the flooring is down and the flooring cannot be completed until the underlying electrical and telephone conduits are installed.) The data is then analyzed, usually by computer, to determine the most efficient schedule for the entire project. Many subprojects may be performed at any time within a given period without any effect on the completion of the entire project. However, some items of work are given no leeway and must be performed on schedule; otherwise, the entire project will be delayed. These latter items of work are on the 'critical path.' A delay, or acceleration, of work along the critical path will affect the entire project. . . ."

23 Cl.Ct. at 244–45 (quoting *Haney v. United States*, 230 Ct.Cl. 148, 168, 676 F.2d 584, 595 (1982)). A project's critical path analysis should be updated regularly while the project is on-going to reflect the evolution of the critical path for the project. *Wilner* 23 Cl.Ct. at 245 (citing *Fortec Constructors v. United States*, 8 Cl.Ct. 490, 505 (1985)).

The court notes that it views plaintiff's claim that acceptance of the project occurred after December 22, 1987, as without merit. Plaintiff's letters of January 18, 1988, and February 14, 1989, indicate acceptance of the project by the Government on December 22, 1987. These letters amount to an admission by plaintiff.

A requisite for government liability for the consequences of a critical path delay is fault on the part of the Government. *William A. Smith Contracting Co. v. United States*, 155 Ct.Cl. 1, 9–10, 292 F.2d 847, 852 (1961) (citing cases). " 'Courts will deny recovery where the delays [of the Government and the contractor] are concurrent and the contractor has not established its delay apart from that attributable to the government.' " *Wilner*, 23 Cl.Ct. at 245 (quoting *William F. Klingensmith, Inc. v. United States*, 731 F.2d 805, 809 (Fed.Cir.1984)). Furthermore, the court is constrained by contract General Provision 17 to award delay damages only for the unreasonable portion of a government-caused delay. Not all delay that occurs along the critical path is unreasonable. *Chaney*, 190 Ct.Cl. at 713, 421 F.2d at 735. However, delay caused by defective specifications is *per se* unreasonable. *Avedon*, 15 Cl.Ct. at 658 (citing *Beauchamp Constr. Co. v. United States*, 14 Cl.Ct. 430, 438 (1988), and *Chaney*, 190 Ct.Cl. at 707, 421 F.2d at 732). Consequently, if plaintiff can prove that a defective specification caused delay along the critical path of the project, plaintiff will be entitled to compensation for all delay days along the critical path.

In order for the court to be able to award damages to plaintiff for government-caused delay along the critical path, the court must have before it evidence that establishes the critical path of plaintiff's project.

Plaintiff produced at trial a diagram illustrating the work on the project involving duct revisions, OWJ revisions, and smoke detectors during the period from May 1986 to December 1987. Plaintiff testified that he derived the information for the diagram, Plaintiff's Exhibit 965, from the Daily Reports to Inspector (the "DRIs")[2] and the Contractor's Quality Control Daily Reports

(the "CQC reports")[3] for the project. Plaintiff asserts that there are 269 delay and additional work days for the duct revision work resulting from the time the problem was discovered, August 28, 1986, until the time the revision work was completed, June 21, 1987, minus 28 days for contract work completed during that period; that there are 113 delay and additional work days for the OWJ revision work resulting from the time the work became critical, June 21, 1987, to the time the work was completed, September 15, 1987, minus 2 days for contract work completed during that period; and that there are 27 delay and additional work days for the smoke detector work resulting from the date the final fire inspection was initially scheduled, November 18, 1987, until the date the final fire inspection began, December 16, 1987.[4]

Plaintiff's diagram is not a critical path analysis. Essential to a determination that an activity belongs on the critical path of a project is an understanding of how that activity affects the other activities. Plaintiff's diagram depicts his version of the delay that occurred with respect to three activities. However, the diagram fails to provide information that would enable the court to verify that these delays occurred along the critical path, because the diagram does not indicate the interdependence of the three depicted activities to the other activities.

Plaintiff asserts that the interdependence of the project's activities is indicated in the progress schedules introduced at trial. Plaintiff proffered the schedules, prepared by him and submitted to the Navy, as his estimates of activities that were on the critical path while the project was on-going. He stated that he had prepared similar progress schedules, wherein he attempted to convey a critical path analysis for a project, hundreds of times. The schedules

---

2. The DRIs indicate the work performed on the job site for each day of the project. They were prepared by plaintiff's superintendent and submitted to the Navy.

3. The CQC reports give a description of the work that took place on each day of the project. They were prepared by plaintiff's CQC representative and submitted to the Navy.

4. Plaintiff is not seeking to recover delay damages for all of these days. The maximum number of delay days for which plaintiff may recover is the number of days that work continued on the contract beyond the original completion date, 447 days, minus the number of days the contract was extended by bilateral change orders, 155 days. This amounts to 292 days.

for the project at issue were submitted on October 21, 1985; October 28, 1985; December 29, 1986; January 30, 1987; March 27, 1987; June 22, 1987; and October 27, 1987. The schedules list the various activities of the project and include for each activity the earliest start date, the earliest finish date, the latest start date, the duration of the activity, and the number of float days for the activity. Plaintiff testified that a "*" in the float column indicates that an activity was a critical path activity. Plaintiff explained that the float is zero at the start of the project for those activities as to which a day gained or lost on the activity affects the completion date of the project and that a negative float, while the project is on-going, indicates that a delay is occurring for a critical path activity.

■ Defendant contends that plaintiff's progress schedules do not indicate the interdependence of the various activities of the project and thus do not amount to a critical path analysis. The testimony of both plaintiff and John James Schmidt, Assistant Engineer in Charge of Construction under the Resident Officer in Charge of Construction (the "ROICC"), support defendant's contention. When asked to indicate how specific activities on a progress schedule related to each other, plaintiff failed to elucidate how the schedule exhibited interdependence of activities. Mr. Schmidt, who has worked with critical path scheduling since the 1950's, testified that he did not consider plaintiff's progress schedules to be critical path schedules in that they did not indicate the interdependence of the activities of the project. The witness stated that during the time at issue contractors normally submitted a bubble diagram indicating the critical path of the project in conjunction with a report similar to plaintiff's progress schedules. The activities listed on the reports would reference specific points on the bubble diagram and would allow one to discern both the interdependence of the activities and where each activity fell along the critical path.

Mr. Schmidt indicated that it might be possible to develop some detail from plaintiff's progress schedules—to develop the interdependence of some activities from the start date, finish date, and duration given for the activities—but that such detail is not "readily apparent" on the progress schedules. Plaintiff did not illustrate how the progress schedules provided details on the interdependence of the activities of plaintiff's project. The court therefore does not consider the progress schedules as establishing the critical path of plaintiff's project.[5]

Plaintiff's failure to provide a critical path analysis is a substantial deficiency in his proof because the opinion in *Wilner I* warned that only defendant's critical path expert analysis afforded the court a basis for evaluating plaintiff's critical path claim. *Wilner*, 23 Cl.Ct. at 253. Chary of proving its opponent's case, defendant this time did not supply expert testimony and a critical path chart. Despite his close call in *Wilner I*, plaintiff offered no critical path expert analysis, but rested his case on truncated charts depicting only the construction activities for which he seeks compensation. This approach was as unorthodox as it was frustrating to parse out under the legal standards applicable to delay claims. Plaintiff presented extensive evidence detailing the delays in the duct revision work, the OWJ revision work, and the smoke detector work. The court will examine this evidence to determine if there is a basis, despite the absence of a critical path analysis for the entire project, for determining that any of these activities was on the critical path of the project and was delayed by the Government while on that path.

### FACTS

1. *Duct revision work*

R.J. Lanthier Co., Inc. ("Lanthier"), a subcontractor to plaintiff, started detailing for the duct work on May 20, 1986. On

---

5. Mr. Schmidt also testified that bar charts provided with some of plaintiff's progress schedules did not indicate how the listed activities interrelated. Plaintiff did not proffer evidence rebutting this testimony. The court does not view the bar charts as demonstrating the critical path of the project.

June 2, 1986, plaintiff forwarded to the Navy a Request for Information ("RFI"), submitted to plaintiff by Lanthier, that noted the following defect in the specifications: "THE DUCT WORK FOR A H–2 WITH A FIRE DAMPER, AT LINE–8 IN MECHANICAL ROOM TO COMPUTER ROOM # 2,—IS CALLING FOR A–11'–6" TEE BAR CEILING. THE BOTTOM OF OUR DUCT WORK WHEN INSTALLED WILL BE 10'–3"[.]" In response to the RFI, James Dowd, Civil Engineer with the ROICC, stated: "Ceiling height in computer room # 2 should be 10'–0" not 11'–6"." The 11'–6" ceiling height was without the access floor, with access floor ceiling height should be 10'–0"[.]" At a CQC meeting[6] on June 4, 1986, Lanthier noted problems with Mr. Dowd's response. Plaintiff suggested that the ceiling height could be lowered 6 inches, and the need for further clarification on this matter was discussed. In a letter of June 17, 1986, Mr. Dowd corrected the defect, authorizing plaintiff to lower the ceiling height 6 inches from 10' to 9'–6".

The DRI of September 2, 1986, notes that Mr. Dowd was informed that ducts entering the second floor from the first floor could not go into the spaces designed for them because of K brace interference.[7] At a CQC meeting on the following day, the parties' representatives noted that the Navy's architectural engineer for the project, the Petersen Architectural Group (the "A & E"), was working on clarification drawings. A September 10, 1986 CQC meeting addressed the fact that fire dampers were missing on the plans. On September 15, 1986, the A & E sent the Navy Clarification Drawings 23 through 26 ("drawings 23–26") to correct the K brace interference problem. Two days later the Navy sent plaintiff a request for a cost proposal ("RFP") for the changes encompassed in these drawings. However, an A & E report of a site visit on September 17, 1986, noted that drawings 23–26 were to be resized and that 9 fire dampers were to be

added. The report stated that Lanthier "estimated the reordering of the revised ductwork to take three weeks, however it will not effect the project schedule." A September 23, 1986 letter from Lanthier to plaintiff stated that, due to the impending redesign of the duct work, Lanthier had not been able to install duct in affected areas and that, to Lanthier's knowledge, changes in the duct system had been in the redesign stage since August 28, 1986. Lanthier noted that any new duct and fire dampers that were required would involve lead time for fabrication and procurement, with a lead time of 4 to 5 weeks for the fire dampers alone.

The minutes of the September 24, 1986 CQC meeting indicate that a discussion took place with respect to a delay situation caused by the redesign of the duct work necessitated by the K brace interference. On September 26, 1986, Mr. Dowd sent plaintiff Clarification Drawings 27 through 31 ("drawings 27–31") as a replacement for drawings 23–26. Drawing 31 added the 9 fire dampers discussed at the September 17, 1986 site visit. The CQC report of September 29, 1986, indicates that the A & E stated that drawings 27–31 added 9 of the 10 fire dampers that were omitted from the plans and specifications and that addition to the plans of the tenth fire damper, not yet designed, was required. On September 29, 1986, plaintiff requested from his subcontractors price proposals for the changes incorporated in drawings 27–31. At an October 1, 1986 meeting, the parties' representatives noted that delivery of fire dampers would take 4 to 5 weeks and that a fire damper was omitted from the drawings.

On October 6, 1986, plaintiff requested that the Navy clarify the elevations in drawings 29 and 30. Plaintiff's RFI noted: "The job is in a delay situation pending clarification and resolution of this situation." On October 19, 1986, Mr. Dowd provided the requested clarification.

**6.** Representatives of plaintiff and the Navy attended CQC meetings. Plaintiff prepared minutes of the CQC meetings and submitted them to the Navy.

**7.** Plaintiff testified that the problem was discovered on August 28, 1986, and that he first informed the Navy about it on that date.

The minutes of the October 8, 1986 CQC meeting reflect plaintiff's request that the ROICC authorize him to order the fire dampers required by drawings 27–31; that a delay situation continued with respect to this matter; and that plaintiff requested the Navy to provide details for the omitted fire damper. On October 10, 1986, plaintiff sent an RFI to the Navy, stating that Lanthier had discovered 11 fire dampers in drawings 27–31 that were not in the original contract and had noted that 3 other fire dampers were missing from the drawings and plans. On October 13, 1986, Lanthier notified plaintiff that it had ordered the fire dampers pursuant to plaintiff's authorization—an authorization that plaintiff gave after receiving assurance from Mr. Dowd that he would process the paperwork for the ordering of the fire dampers.[8] The October 15, 1986 CQC meeting addressed the need for clarification on the location of fire dampers and fire rated walls.

On October 17, 1986, the A & E sent the Navy revised Clarification Drawings No. 27 through 31 ("revised drawings 27–31"). On October 23, 1986, plaintiff submitted to the Officer in Charge of Construction (the "OICC") a cost breakdown for the duct work changes encompassed in drawings 27–31 as initially proposed. On that same date, plaintiff requested from his subcontractors price proposals for the duct work changes in revised drawings 27–31.

On November 10, 1986, plaintiff sent the OICC a price proposal for the additional work encompassed in revised drawings 27–31. At a November 26, 1986 meeting, plaintiff noted that he had requested a total of $113,000.00 and 5 additional months for modifications to the duct work and that approximately 4 months' delay was attributable to the duct work thus far. By the December 3, 1986 and the December 9, 1986 CQC meetings, Mr. Dowd had not received any answers on the delay situations addressed at the November 26, 1986 meeting.

On December 16, 1986, plaintiff forwarded to the OICC a letter sent by Lanthier to plaintiff stating that Lanthier could not complete the duct installation until it received further directions on the modifications. As of the January 7, 1987 CQC meeting, Mr. Dowd was awaiting the A & E's estimate on the duct work before proceeding further. Mr. Dowd needed the A & E's estimate in order to negotiate a change order with plaintiff. On January 12, 1987, the A & E sent the Navy a cost estimate for revised drawings 27–31. At the January 27, 1987 CQC meeting, plaintiff noted that every day of delay in resolving the duct work problem was a day of delay for the project.

On February 7, 1986, plaintiff sent an RFI to the attention of Mr. Dowd at the ROICC, stating that no exhaust fan or window was provided for one of the bathrooms and asking for clarification with details on this matter. Additional duct work was authorized to alleviate the problem.

At the February 18, 1987 CQC meeting, Lieutenant ("Lt.") Jim Teahan, who was working with the ROICC to ascertain the cost for the duct work revision, indicated that he was involved in trying to resolve the delay caused by the duct work. On February 27, 1987, Lt. Teahan prepared an internal government "ATP [Authorization to Proceed] Checklist" for the duct work revisions. Under the heading *"IMPACT ON CONTRACT WITHOUT ATP,"* Lt. Teahan wrote the following: "HVAC DUCT INSTALLATION IS ON CRITICAL PATH. EXTENDED O.H. [overhead] IS ACCRUING UNTIL GOV'T DIRECTS THE CHANGE BE MADE. CRITICAL PATH IS PRESENTLY AT AN ALL-STOP." Under the heading *"FUNDS ...* $ AMOUNT" Lt. Teahan wrote "75,000 + 20,000 = $95,000[.]" Undated notes of Lt. Teahan contained these same numbers and in addition stated the following: "I SUSPECT MEL'S [plaintiff's] FIGURE OF $88,377 INCLUDES EXTENDED FIELD O.H. OF ABOUT 180 DAYS BUT NO H.O. [home office] O.H. COSTS. HIS DEFINI-

---

**8.** On October 27, 1986, the Navy gave plaintiff official authorization to order the fire dampers required by RFP No. 21.

TION OF DELAY & IMPACT SEEMS TO BE H.O.OH AND HE'S HINTED THAT HE'LL USE THE EICHLEAY FORMULA TO CALCULATE HOOH. HIS ESTIMATE OF HOOH ON THIS CHANGE IS APPROX. $100K. HE MAY BE ABLE TO JUSTIFY THIS USING EICHLEAY[.]"

On February 27, 1987, the Navy sent plaintiff a letter regarding the duct work revisions, stating: "[Y]ou are hereby authorized to proceed with the following proposed change order. Cost of the work shall not exceed $90,000 pursuant to your written quotations of 23 October and 10 November 1986." The letter continued: "Total costs authorized hereby are subject to approval by the Officer in Charge of Construction, Camp Pendleton. No payment will be made under this Authority to Proceed pending issuance of a formal modification." Plaintiff's response of March 9, 1987, stated the following:

Analysis of your counter proposal provides that we stipulate to the following conditions of change to our contract.

1. Payment for performance will be at the discretion of the Contracting Officer.

2. The maximum price allowed for the work will be $90,000.00. Finalization of the amount of change has not be ascertained.

3. Requested time for the additional work is understood to be the quoted days on our proposal.

Conditions for acceptance of the two price proposals were limited to the number of days in our correspondence of October 23 and subject to an increase in price in our correspondence of November 10, 1986. It is our belief that the proposed maximum price has been exceeded in actual cost to our company. We therefore regretfully have to refuse acceptance of the conditions of the total price.

Our contracts with our material suppliers and subcontractors require payment on a monthly basis. If we do not perform in accordance with our contracts, we would have to pay additional costs to our suppliers and our subcontractor's contracts would be null and void due to the breach of non payment. Furthermore, our contract with the Government requires payment monthly and we will not accept payment under any other terms of the original contract we have signed.

The delay time will need to be added to the additional time required to do this additional work. We therefore cannot accept the original quoted time extensions.

We propose that you issue a change order in accordance with our correspondence of March 5, 1987 [a letter quoting a price of $88,377.00, not including delay costs and their impact]. It would be understood that payment would be made on a monthly basis in accordance with the contract and the cost of the delay would be in addition to our quoted price of March 5, 1987. The delay is still continuing and our costs are increasing day by day. As previously stated, we intend to be reimbursed for the cost of this delay.

Although the Navy's letter of February 27, 1987, did not state that plaintiff would waive any claims related to the work as to which the letter authorized plaintiff to proceed, plaintiff testified that he understood from past experience that, if he signed the letter, he would be bound to the conditions of the Navy's proposal.

Plaintiff and Lt. Teahan around this time attempted to negotiate an agreement for the costs of the duct revision, but were unable to concur on all aspects of the costs, including home office overhead rates. On March 13, 1987, plaintiff sent a second letter to the OICC regarding the Navy's February 27, 1986 letter. Plaintiff referred to the Navy letter as a notice to proceed and stated: "In accordance with the contract requirements, we will proceed when we are issued a conforming standard form 30 change order for the requested work."

By the March 18, 1987 CQC meeting, it was understood that plaintiff was rejecting a bilateral change order that had been issued by the Navy for the duct revisions and that the Navy would be issuing a unilateral change order. Plaintiff's minutes

of the meeting reflect: "Lt Te[a]han said the Navy agreed it was their fault there was a delay from August 1986 to March 1987. Lt Te[a]han said he felt that any delay at this point in time would not be the Navy's." Plaintiff testified that one of the justifications given by Lt. Teahan to support his assertion that future delay would not be the fault of the Navy was the Navy's issuance of an authorization to proceed.

As of the March 25, 1987 CQC meeting, the duct work was still in a delay situation. At the April 29, 1987 CQC meeting, plaintiff inquired as to when it would receive the change order for the duct work, and Mr. Dowd responded that he did not know. By the May 20, 1987 CQC meeting, the delay situation for the duct revisions had not ended.

The CQC report of May 26, 1987, states: "John Schmidt, ROICC, said the person, who was supposed to have signed the unilateral on the ductwork revisions in West-Div [Western Division, Naval Facilities Engineering Command, ROICC], went on vacation. His replacement did not sign it. John said Lt Barre is doing what he can to get someone in WestDiv to sign this piece of paper and mail it to the ROICC office." On May 29, 1987, the Navy executed a unilateral change order for the duct revisions, increasing the contract price by $98,573.00 and extending the contract by 178 calendar days.

Plaintiff testified that the work required by the change order was work beyond the initial scope of the contract and that this work was performed from June 3, 1987, to June 21, 1987. Plaintiff asserted that he derived these dates from the DRI and CQC reports. He also indicated that 2 other days of additional work relating to the duct work occurred on March 9, 1987, and March 10, 1987.[9]

### 2. OWJ revision work

Open web joists—referred to as "OWJ"—are steel joists forming the struc-ture of a roof. Plaintiff, on September 23, 1986, submitted to the ROICC, attention Mr. Dowd, an RFI that stated: "The installer is questioning if the roof decking in the affected areas will carry the weight of the piping and the weight of the liquid in it. Please clarify. He is suggesting installing from the floor with an I-beam [putting in columns from the concrete floor and supporting the piping off the columns]." Mr. Dowd's response of September 30, 1986, provided the following: "Sheet M–9 details 1 and 4 (upper support) cannot be used. Support should be per MSS SP58 & SP69[.] Using floor support is acceptable subject to approval of proposed system[.]" By the October 1, 1986 CQC meeting, Mr. Dowd had asked the A & E for additional information to rectify the problem.

The ROICC on October 7, 1986, received a second RFI requesting clarification on the OWJ work. The RFI stated that the installer was concerned about the structural design provided in the plans and specifications and that bowing was occurring in areas already installed. At the October 8, 1986 CQC meeting, discussions continued with respect to whether the OWJ was strong enough to carry the piping and the liquid that would be in it. On October 20, 1986, R.A. Horais of SEI San Diego Structural Engineers, the structural engineer for the A & E, wrote to the Navy and suggested modifications to correct the bending in the OWJ work.

On November 4, 1986, the Navy sent plaintiff instructions on the hanging of pipes from the OWJ structures. Plaintiff testified that these instructions required plaintiff to perform additional work on the contract. On November 6, 1986, plaintiff forwarded to the OICC a letter from his subcontractor that noted concern with the Navy's instructions because they did not solve the OWJ bending problem.

On November 21, 1986, the Navy sent a letter to plaintiff requesting that plaintiff

9. Although the transcript of trial seems to indicate that plaintiff responded in the affirmative to defense counsel's query whether plaintiff was claiming additional work days from March 9 to June 21, plaintiff's earlier testimony and his exhibits indicate that plaintiff does not claim additional work days for that entire period.

provide a price proposal by November 28, 1986, for work relating to the OWJ problem. Although the Navy provided a description of the work, no drawings or plans for the work were included. Plaintiff, in a letter dated November 24, 1986, responded that he had received the request on that date and could not submit a price proposal by the deadline because he needed to mail the request to his subcontractors. Plaintiff also around this time requested that the Navy provide drawings or plans for the work. A letter of February 6, 1987, from the structural engineer to the A & E, provided further clarification about the OWJ work and indicated that plaintiff had requested clarification from the structural engineer. Plaintiff received a copy of the letter on February 23, 1987. Plaintiff testified that the letter did not clarify the OWJ problems and that no plans or drawings had been received.

During a site visit on March 4, 1987, the structural engineer recommended to plaintiff, the Navy, and the A & E a means for correcting the OWJ problem. On March 9, 1987, the Navy asked plaintiff to provide a cost proposal for the work recommended by the structural engineer. The Navy did not provide plans or drawings with the letter, despite plaintiff's continued requests for them.

An internal government memorandum of March 19, 1987, from the ROICC to the OICC, states that the proposed change order ("PCO") relating to the OWJ problem, PCO No. 23, "corrects an apparent A/E design deficiency which may involve A/E financial responsibility."

A letter of March 31, 1987, from plaintiff to the OICC, attention Mr. Dowd, detailed the actions taken by plaintiff and the ROICC to alleviate the OWJ problem. The letter indicated that plaintiff was unable to proceed further because of the lack of conforming change orders and that plaintiff would be seeking delay costs. A second letter from plaintiff, dated March 31, 1987, also addressed to the OICC, attention Mr. Dowd, quoted a price of $21,106.00, for RFP No. 23, subject to certain conditions, despite plaintiff's not yet having received plans or drawings. Plaintiff, after a negotiation meeting on May 22, 1987, revised the estimate for the work to $20,710.00.

At the May 22, 1987 meeting, it was determined that plaintiff's subcontractor would install one set of the required supplemental bridging immediately and that the structural engineer would review the work on May 28, 1987, to determine if any modifications were necessary. The structural engineer took no exception to the bridging installation, but suggested that some adjustments be made on related work. As of a June 3, 1987 meeting, the mechanical engineer had not decided where to place the remaining bridging that needed to be installed, and plaintiff was continuing to request plans or drawings for the supplemental work. On June 11, 1987, the A & E sent the ROICC, attention Mr. Schmidt, the Assistant Engineer in Charge of Construction under the ROICC, the requirements for installation of the additional bridging and other work related to the OWJ problem.

On June 18, 1987, the Navy sent plaintiff an authorization to proceed on PCO No. 23 stating that costs should not exceed $21,-000.00 and were subject to approval by the OICC. Plaintiff testified that his understanding of this type of authorization was that, if he had signed it, he would have been agreeing to the conditions set forth by the ROICC and that he would have been relinquishing the right to collect delay costs.

A letter of June 24, 1987, from plaintiff to the OICC, attention Mr. Schmidt, reflects that plaintiff anticipated receiving drawings that indicated where the ROICC wanted the additional bridging located. In an August 18, 1987 letter, the Navy again authorized plaintiff to proceed with PCO No. 23, subject to conditions similar to those detailed in the earlier authorization. The Navy's letter also requested a price proposal from plaintiff by August 28, 1987, for certain additional related work. Plaintiff, in a letter to the OICC on August 19, 1987, referred to the authorization as a counterproposal and a notice to proceed and expressed concern over the conditions

relating to, among other items, costs and payments. Plaintiff also indicated that he would make an effort to give the requested price proposal by the date specified, but that he was unlikely to be able to do so because he needed to obtain cost estimates from his subcontractors first. On August 19, 1987, plaintiff having received the OWJ drawings and specifications, dated August 14, 1987, forwarded them to his subcontractors and requested that the subcontractors provide estimates for any additional costs that they would be claiming. On September 2, 1987, plaintiff notified the OICC that he had submitted the requested price proposal and was available for negotiations.

On August 21, 1987, Mr. Schmidt prepared two different government estimates for the work for PCO No. 23. One estimate stated the total cost to be $39,344.00 and the time extension to be 52 calendar days, while the other estimate stated the total cost to be $67,991.00 and the time extension to be 172 calendar days. The first estimate stated under "REMARKS": "Current Contract Completion Date 4 Oct '87[.] Critical Path Activities Mech[anical] Piping to Completion of Job 4 Oct 87 to 25 Nov '87 52 Days[.]" Also under "REMARKS" appeared the following: "XOH 52 × 275 = $14,300[.]" The estimate included this amount, $14,300.00, as the field overhead portion for the prime contractor's segment of the work. The estimate also provided for home office overhead on the prime contractor's work. The other estimate indicated under "REMARKS" that there were 286 days from the date the problem was identified, November 5, 1986, until the date the ATP was issued, August 18, 1987; that there were 114 "Concurrent Days" with the duct revisions, November 5, 1986, to February 27, 1987 (the date an ATP was issued for the duct revisions); and that there were 172 "Additional Days," February 27, 1987, to August 18, 1987. The following notation also appeared under "REMARKS": "XOH = $275 × 172 = 47,300[.]" The estimate included this amount as field overhead and also provided for home office overhead on the prime contractor's work.

Mr. Schmidt testified that he did not consider the OWJ work required by PCO No. 23 to be critical path activity when he prepared the estimates. He stated that the draft was prepared as an estimate to be used by the OICC for finalizing a change order for the work. Under questioning by plaintiff's counsel, the witness stated that he could not recall which of the two estimates he prepared first, what the extensions of 52 calendar days and 172 calendar days were intended to represent, and what the $275.00 figure represented. However, when the court asked about the estimates, Mr. Schmidt stated that the document estimating an extension of 52 calendar days indicates that the ROICC had estimated that the work required by PCO No. 23 would take an additional 52 days and that the ROICC was willing to extend the contract by that number of days. Mr. Schmidt explained that the number of days to extend the contract and the $275.00 rate were numbers provided to him so that he could prepare the estimates and that he was uncertain as to how they were derived. Mr. Schmidt testified that during the time period at issue, the ROICC methodology for computing compensation for additional work consisted of adding the number of days required to complete the work to the end of the contract and compensating the contractor for such days. Mr. Schmidt explained that this methodology is a different approach than one that extends the contract a day only if there is a delay on the critical path.

On September 22, 1987, the Navy executed a unilateral change order for the supplemental OWJ work, increasing the contract price by $34,967.00 and extending the contract by 52 calendar days to November 25, 1987. It is defendant's position that the unilateral change order extended the contract time, but did not compensate for delay. Plaintiff testified that he received the change order on September 25, 1987; started the work on September 29, 1987; and completed the requested work on October 15, 1987. Plaintiff claims that work beyond the initial scope of the contract occurred between September 29, 1987, and October 15, 1987, and that he derived

these dates from the CQC reports and DRIs.

### 3. *Smoke detector work*

At the July 8, 1987 CQC meeting, the Navy's and plaintiff's representatives discussed the correctness of the plans with respect to certain aspects of the smoke detectors, the fire alarm system, and the smoke purge fans. At the July 15, 1987 CQC meeting, Mr. Schmidt stated that he did not have a response as to whether the fire alarm system was correctly designed. Plaintiff indicated that he would proceed per approved submittals, plans, and specifications. Mr. Schmidt also advised that he did not have an answer on the question concerning the smoke purge fans. On August 6, 1987, Mr. Schmidt provided plaintiff with a clarification drawing on the smoke purge fans. Plaintiff enclosed the drawing in a letter to his subcontractors on August 10, 1986, noting that he did not consider the modification to increase the costs of the contract.

At the October 7, 1987 CQC meeting, plaintiff asked how WestDiv, which was responsible for conducting the fire inspection of the building, wanted to handle the fire inspection. At the October 14, 1987 CQC meeting, the parties' representatives learned that the base fire chief would conduct an inspection and then WestDiv would perform a final inspection. Clarification was needed as to when the inspections would occur and as to who would conduct a halon discharge test. By the October 21, 1987 CQC meeting, WestDiv had not indicated when it would conduct the inspections. At the October 28, 1987 CQC meeting, plaintiff was informed that WestDiv would conduct the halon discharge test.

Plaintiff's final progress schedule dated October 27, 1987, listed a start date of November 6, 1987, for the fire inspection. The schedule noted the fire inspection to be a critical path activity as of that date, and the schedule estimated a project completion date of December 1, 1987. As of the November 4, 1987 CQC meeting, the base fire inspection was scheduled for November 13, 1987, and the WestDiv fire inspection for November 18, 1987. A letter from the Navy to plaintiff on November 12, 1987, indicated that the WestDiv inspection would take place around November 24, 1987, after a successful 10–day in-service requirement. Plaintiff testified that the 10–day in-service requirement was fulfilled prior to the scheduled base inspection for November 13, 1987.

The building passed the base fire inspection on November 13, 1987. Plaintiff testified, however, that the fire chief questioned whether the smoke purge fan servicing the lobby was appropriate, despite its being in compliance with the specifications and plans. On that same date, plaintiff sent an RFI to the ROICC, attention Mr. Schmidt, regarding this matter. A letter from the Navy to plaintiff on November 18, 1987, indicated that the WestDiv inspection would take place on November 23, 1987.

At the November 18, 1987 CQC meeting, plaintiff discussed his concern with the smoke purge system and informed the ROICC that the halon system was ready to be tested. A memorandum of November 19, 1987, from WestDiv to the ROICC required changes in the smoke purge system and the installation of additional smoke detectors. Minutes of the November 25, 1987 meeting indicate that the smoke purge fan requirements were in the process of being submitted to "the A & E for directions by the ROICC." On December 4, 1987, the A & E sent the Navy a description and clarification drawings for the requested modifications for the smoke purge system. The letter indicated that there was still one matter that needed to be clarified. At the December 9, 1987 CQC meeting, plaintiff received the A & E's modifications.

On December 9, 1987, the Navy issued an authorization to proceed, subject to certain conditions, with respect to the modifications to the smoke purge system and the installation of the additional smoke detectors. On December 10, 1987, plaintiff ordered his subcontractor to proceed with the work on "T & M [time and materials]." WestDiv performed the fire inspection on December 16 and 17, 1987. Plaintiff testified that the work on the smoke detectors

and the smoke purge system was fully completed, inspected, and approved by the Navy on December 17, 1987, except for some painting. Plaintiff claims additional work days for the period of December 9, 1987, to December 16, 1987.

### 4. *Weather days*

On April 14, 1986, plaintiff wrote the OICC, attention Mr. Dowd, to request an extension of 112 calendar days on the contract due to weather conditions. Plaintiff testified that, at the time he wrote the letter, he was concerned about receiving change orders for delays relating to the contract start date and a pile design change, items later covered through bilateral modifications. He asserted that Mr. Dowd had promised that change orders would be issued and that he was concerned because no change orders had been issued although 6 months had elapsed since the first incident for which plaintiff was seeking a change order. Plaintiff testified that late in 1987 Mr. Schmidt and Lt. Barre informed him that no change order for weather was going to be issued. Mr. Schmidt testified that he did not recall having a conversation with plaintiff about a weather-based extension of the contract.

On October 20, 1988, the OICC, specifically, Contracting Officer Dennis B. Wilkins, issued a unilateral change order extending the contract 34 calendar days from November 25, 1987, to December 29, 1987, for unusually severe weather conditions encountered at the job site during the time period of December 4, 1985, through April 14, 1986. Mr. Wilkins testified that he utilized DRIs, CQC reports, weather report information, and input from the engineers and Construction Representative to determine if a specific day was a rain delay day. The 24 work days that he denominated rain delay days were days on which the rainfall was outside the norm for that period of

time or follow-on days to excessive rain days when the site was too wet for contract work. Plaintiff asserts that work was on-going on the project for some of these 24 days and that such days are not properly non-compensable rain delay days.

For those rain delay days granted by Mr. Wilkins, which plaintiff claimed at trial were days on which work was on-going, Mr. Wilkins, by referencing the CQC reports and DRIs for those dates, substantiated the basis for his determinations that the days were rain delay days. The court finds that Mr. Wilkins' determinations were valid with the exception of one day, March 20, 1986, on which the CQC report of that date indicated that a concrete pour took place. Thus, the weather extension should have been for 33 calendar days, rather than 34 calendar days.[10]

### 5. *Contracting officer's decision*

On February 19, 1988, plaintiff requested a final decision from the contracting officer, claiming the Navy failed to compensate him fully for extra work incurred in performance of the unilateral change orders issued by the Navy. Contracting Officer William N. Lindstrom, assigned to review the claim in November 1988, issued a final decision on August 1, 1989. Contracting Officer Lindstrom relied primarily on a technical review performed by the Engineering Construction Division to formulate the final decision.

Contracting Officer Lindstrom awarded delay costs, based on the technical review's recognition of plaintiff's entitlement to extended overhead for the extension days provided by the unilateral modifications. While he did not personally review any critical path analysis of plaintiff's project, or know of the existence of such an analysis, it was the practice of his office to develop evidence that a contractor's work actually was delayed before awarding de-

---

**10.** Of the 24 days that Mr. Wilkins determined were rain delay days, 2 days had already been recognized as delay days by a modification of the contract for another issue. Mr. Wilkins thus added 22 work days to the current contract completion date at the time, arriving at a weather extension of 34 calendar days. The court

finds this method of calculating the extension to be accurate for determining the number of calendar days on which the project was affected. The court used this method to determine that the weather extension should be 33 calendar days.

lay damages. Contracting Officer Lindstrom viewed the final decision as compensating plaintiff for critical path delay on the project. In rendering his decision, he attempted to weigh both sides equally and had the technical review conducted to enable him to do so. He believed that plaintiff was entitled to damages for critical path delay because the technical analyst, his consultant, and counsel who conducted a legal review of the technical analysis thought that compensation was due. Contracting Officer Lindstrom did not conduct an independent analysis of plaintiff's delay claims.

Contracting Officer Lindstrom determined that there were 447 calendar days from the original contract completion date of October 1, 1986, to the actual completion date of December 22, 1987. He subtracted from 447 the number of days granted by bilateral modifications, 153 days, and the number of weather extension days, 34 days, and determined that the resulting number, 260 calendar days, was the maximum number of days for which plaintiff could receive delay damages.[11]

The technical analyst determined that 17 days were expended on additional work for the contract. Although the contracting officer did not know precisely which records the technical analyst examined to determine the number of additional work days, he stated that normally the daily reports or updated progress schedules would be probed for this information. The contracting officer, in his calculations, allowed for 17 days of additional work.

With respect to the calculations for home office overhead, the contracting officer indicated that he relied on an incorrect determination of the technical analyst. He stated that the technical analyst incorrectly reduced the 260 calendar days to 186 work days to calculate costs. He indicated that calendar days should have been used because the rate for home office overhead was based on calendar days. Additionally, he stated that he believed the rate applied

was based on a 100–percent overhead assessment.

Contracting Officer Lindstrom applied Defense Contract Audit Agency ("DCAA") recommended rates for the CQC representative and superintendent. Calendar days appropriately were converted into work days in the calculations of costs for these items, since plaintiff's claim had calculated these rates based on work days rather than calendar days. At trial plaintiff unsuccessfully challenged the calculations of the DCAA auditor, Maria G. Doromal, in arriving at the rates. Plaintiff contended that field overhead costs should have been included in the calculation of the rates for the CQC representative and the superintendent. Ms. Doromal definitively established that plaintiff did not provide her with any documentation to support including field overhead costs in the determination of the rates.

A profit of 6 percent was applied to the additional work days in the calculations for direct field overhead costs and home office overhead, as well as to the costs for additional subcontractor work. A bond of 0.6 percent, an amount determined by a DCAA audit, was applied to all the costs. In computing direct field overhead costs, the technical analyst excluded the costs of the CQC representative for 11 days and the costs of the superintendent for 7 days because those were days wherein plaintiff acted as CQC representative or superintendent. This exclusion prevented plaintiff from receiving double compensation since a salary for plaintiff was included in the cost for home office overhead. At trial the contracting officer indicated the specific days that had been disallowed by the technical analyst, referencing the applicable DRIs and CQC reports where plaintiff had signed off as the CQC representative or the superintendent. The contracting officer also established that plaintiff had acted as CQC representative for an additional 7 days over those noted in the final decision.

After totaling the costs of direct field overhead costs, additional subcontractor

---

**11.** The actual number of extension days granted by bilateral modifications was 155, not 153.

Accordingly, the total compensable days should have been 258 rather than 260.

work, and home office overhead, the contracting officer subtracted out the amount already received by plaintiff through unilateral modifications. This resulted in a determination that an amount of $17,259.46 was owed to plaintiff; including interest, the amount was $20,060.00. On September 21, 1989, the Navy increased the contract in the amount of $13,601.00. This represented the amount owed to plaintiff, as determined by the final decision, minus $6,459.00, the amount owed by the contractor to the Navy for corrections of construction deficiencies and warranty items.[12]

## DISCUSSION

1. *Responsibility for and duration of delays; critical path*

a. Duct revision work

The evidence on plaintiff's claim for duct revision work establishes that there was a defect in the plans for the project requiring that the Navy revise some drawings for the duct work. In addition, the evidence substantiates that delay in completing the duct work resulted from the defect. Plaintiff asserts that the delay spanned the date on which the defect was discovered through the date on which the duct revisions were completed and that the duct work was on the critical path of the project during the entire time of the delay.

■ Plaintiff's progress schedules of December 29, 1986; January 30, 1987; March 27, 1987; and June 22, 1987, identify "DUCT CHANGES" as being on the critical path by an " * " notation in the days of float column. However, because plaintiff failed to establish that these schedules represent a critical path analysis, the court cannot accept the notation as dispositive that the duct changes were on the critical path on the dates listed on the progress schedules. Furthermore, even if the court

accepted the schedules as establishing that the duct revision work was on the critical path of the project and found that the Navy caused the delay on the duct work, the court could not find that the Navy was responsible for delay in completion of the project. Without a critical path analysis, the court cannot exclude the possibility that the contractor caused concurrent delay on the project. *See Wilner,* 23 Cl.Ct. at 245. Critical path analysis is utilized to prove delay solely attributable to the Government. *Id.* Plaintiff's progress schedules are not sufficient to prove attribution.

■ The evidence most beneficial to plaintiff's claim is an internal Navy document, the "ATP [Authorization to Proceed] Checklist" of February 27, 1987, prepared by Lt. Teahan, indicating that the duct revision work was on the critical path, that the critical path was at an all-stop, and that "EXTENDED O.H. [overhead]" would be accruing until the Navy directed that a change be made. This document constitutes an admission by the Navy that, as of February 27, 1987, the duct revision work was on the critical path of the project, the critical path was at an all-stop, and the Navy was responsible for compensating plaintiff for extended overhead until the Navy directed a change. The difficulty with this document is that it does not establish the precise date on which the Navy became responsible for critical path delay. Plaintiff asserts that the Navy is responsible for critical path delay from August 28, 1986. However, the evidence introduced at trial, including discussions of delay at CQC meetings and requests for extensions of time by plaintiff, is insufficient to establish that the Navy is responsible for critical path delay prior to February 27, 1987.[13]

---

**12.** Mr. Schmidt prepared the estimate for the amount owed by the contractor for correction of deficiencies and warranty items. At trial plaintiff's counsel was unsuccessful in undermining the accuracy of Mr. Schmidt's determinations with respect to the amount owed by the contractor. The court finds no error in the amount disallowed by the Navy.

**13.** The statement attributed to Lt. Teahan in plaintiff's minutes of the March 18, 1987 CQC meeting does not constitute an admission of government-caused critical path delay. The document refers only to delay, not critical path delay, and was prepared by plaintiff, not defendant.

Defendant asserts that any critical path delay attributable to the Navy because of the duct work delay does not extend beyond the date on which the Navy authorized plaintiff to proceed with the duct revision work, February 27, 1987. Plaintiff contends that the delay attributable to the Navy continued until plaintiff received a change order for the work on May 29, 1987. "[A] change authorization is not a change order...." *J.D. Hedin Constr. Co. v. United States*, 171 Ct.Cl. 70, 96, n. 7, 347 F.2d 235, 252 (1965) (delay attributable to Government did not end until change order was issued). A contractor is not obligated to proceed until a change order is issued. *Id.* Therefore, delay attributable to the Navy continued until plaintiff received the change order for the work.[14]

Critical path delay attributable to the Navy extends from February 27, 1987, to May 29, 1987. This amounts to 91 days.

■ In addition to claiming damages for delay days, plaintiff seeks damages for additional work days. Plaintiff asserted that he derived the number of additional work days from the CQC reports and DRIs. However, he indicated that the court would not be able to discern, by examining the reports, the additional work on each day that he claims as an additional work day because some of the work was conducted off-site by subcontractors and was not noted on the reports. This proof is insufficient to entitle plaintiff to days of additional work for the work completed by him in accordance with the change order. Plaintiff has failed to establish delay or additional work attributable to the Navy beyond May 29, 1987, the date on which plaintiff received the change order for the duct work.

#### b. OWJ revision work

■ The evidence presented at trial establishes that the OWJ revision work was required to correct a design deficiency. A Navy memorandum of March 19, 1987, states that the change order relating to the revision work "corrects an apparent A/E design deficiency." The Navy is responsible for the design defect with respect to claims by plaintiff since the A & E was a subcontractor of the Navy. Consequently, the Navy is responsible for the delay in correcting the design problem from the time the problem was discerned until the time the problem was resolved.

■ Plaintiff contends that delay costs resulted due to the OWJ revisions from the time these revisions became a part of the critical path. According to plaintiff, the OWJ revisions became critical on June 21, 1987, the date on which the duct revision work was completed. Plaintiff's declarations that the OWJ work became critical on that date are insufficient to establish that to be the case. Both plaintiff and Mr. Schmidt testified that the OWJ revision work was not dependent on the duct revision work and therefore could have been completed prior to completion of the duct revision work. The absence of a critical path analysis prevents the court from discerning whether the OWJ design defect may have been discovered earlier, but for a delay of the contractor. The court cannot rely on assertions of a contractor, not supported by a critical path analysis of the project, to award critical path delay costs. *See Wilner*, 23 Cl.Ct. at 255–56.

As with the duct revision claim, the evidence most beneficial to plaintiff with respect to the OWJ revision claim is a possible admission by the Navy that it was responsible for critical path delay for the OWJ revision work. Mr. Schmidt prepared two separate esimates for the OWJ revision work. Both estimates included in the costs for the prime contractor's work amounts for field overhead and home office

---

**14.** Mr. Schmidt's testimony supports this determination. Mr. Schmidt testified that the purpose of ATPs is to describe the work and amount of money that may be expended for the task that the ATP authorizes a contractor to proceed on. He indicated that ATPs are intended to be followed by negotiations that result in the parties' finalizing the ATP into a change order by a bilateral modification. He acknowledged that, when the contractor and the Navy are unable to reach a bilateral modification, the Navy would issue a unilateral modification if it wanted the work completed.

overhead. One of the estimates specifically noted, with respect to the number of days that it gave for extension of the contract, "Critical Path Activities Mech[anical] Piping to Completion of Job 4 Oct 87 to 25 Nov '87 52 Days[.]" Mr. Schmidt testified that, despite this notation and the allowance for field overhead and home office overhead, he did not consider the OWJ revision work to be critical path activity. He explained that the practice at the ROICC, at the time the estimates were prepared, was to extend the contract by the number of days required to complete the change order work and to compensate the contractor for such days, without analyzing whether the Navy was responsible for a critical path delay.

The court found the testimony of Mr. Schmidt the product of a selective memory, but on the whole credible. Additionally, the court notes that plaintiff did not offer any contradictory testimony to detract from Mr. Schmidt's explanation of how the change order estimates were prepared. While the ROICC may have been willing to provide the contractor with delay costs regardless of whether the Navy caused critical path delay, the court cannot do so. The evidence relating to the OWJ revision work is insufficient for this court to attribute critical path delay to the Navy. Additionally, the evidence is insufficient to establish additional work days relating to the OWJ work. See *supra* p. 275 for discussion of additional work days for duct work.

### c. Smoke detector work

The evidence introduced on plaintiff's claim for delay relating to smoke detector work indicates that the Navy was responsible for moving the date of the final fire inspection back from November 18, 1987, the date on which it was originally scheduled, to December 16, 1987. After a base fire inspection on November 13, 1987, the Navy determined that modifications were required for the smoke purge fan system and that additional smoke detectors were needed in the building. Plaintiff asserts that the fire inspections could not be conducted until all other work in the building,

including the OWJ work, was completed and that the fire inspections were a critical path activity from November 13, 1987, the date of the scheduled base fire inspection. Plaintiff contends that critical path delay occurred from November 18, 1987, to December 16, 1987.

 Defendant correctly points out that, because no critical path analysis has been introduced, it is impossible to determine if the fire inspections could have been scheduled earlier, but for a delay attributable to plaintiff. The significance of this contention is that, if the fire inspections could have been scheduled earlier and conducted earlier, they could have been completed prior to November 25, 1987, the existing contract completion date. If the final fire inspection had been conducted prior to the contract completion date, the court would view the Navy-caused delay at issue as reasonable and non-compensable. The absence of a critical path analysis for the project prevents the court from determining that critical path delay, attributable to the Navy, occurred with respect to the smoke detector work. Additionally, the evidence is insufficient to establish additional work days relating to the smoke detector work. See *supra* p. 275 for discussion of additional work days for duct work.

### 2. *Weather delay*

 Typically, a contractor may not recover for government-caused delay that is concurrent with weather delay. *Wilner*, 23 Cl.Ct. at 245 (citing cases). However, where, but for delays attributable to the Government, a contractor would have completed the project when it experiences weather delay days, the contractor is entitled to recover delay damages from the Government for such weather delay days. *J.D. Hedin Constr. Co. v. United States*, 171 Ct.Cl. 70, 98, 100–01, 347 F.2d 235, 253–55 (1965); *Langevin v. United States*, 100 Ct.Cl. 15, 28 (1943). If plaintiff had proved that he would have completed the contract by March 5, 1987, the date to which the contract was extended by the 155 days of bilateral modifications, except for delays attributable to the Navy, plaintiff would

have been entitled to recover delay damages for weather delay days that occurred after March 5, 1987. The last weather extension day given by the contracting officer was for March 21, 1986. Because the contract was extended by bilateral modifications to March 5, 1987, it is impossible for plaintiff to prove that he would have completed the contract prior to March 21, 1986, but for government-caused delay. The 33 days for which the contract is extendable due to weather delays must be subtracted from the total days for which plaintiff can receive delay damages, because plaintiff cannot receive compensation for weather days that occurred when the fault was not solely the Navy's that plaintiff had not completed work on the project.

### 3. Damages

The court's findings attribute considerably less critical path delay to the Navy then did the contracting officer's final decision. The court did not assign any weight to either the unilateral modifications issued by the contracting officer or the final decision of the contracting officer. The court analyzes below whether weight should, in fact, be given to both of these determinations.

#### a. Unilateral modifications

In *J.D. Hedin Construction*, the Court of Claims stated:

The grant of an extension of time by the contracting officer carries with it the administrative determination (admission) that the delays resulted through no fault of the contractor. However, this does not mean that where "the Government refrains from exercising its right to collect liquidated damages [by extending the time of performance], though that forbearance may tend to raise some question of government-caused delay, it is * * * tantamount to admitting liability for breach of contract * * *." It is up to this court to determine the extent of the delay for which defendant is responsible. However, "[t]he findings of the contracting officer have been said to constitute a strong presumption or an evidentiary admission of the extent of the Govern-

ment's liability, but always subject to rebuttal...."

171 Ct.Cl. at 83–84, 347 F.2d at 245 (citations omitted). *Hedin* requires that the court determine the extent of government-caused delay, but indicates that the findings of a contracting officer are entitled to a strong presumption of validity, subject to rebuttal.

The problem that the court perceives is that its determinations thus far reflect the government-caused delays as proved by plaintiff at trial, rather than what the court perceives, but plaintiff failed to prove, to be the actual government-caused delays. However, to determine the amount of government-caused delay, "there is no reason to defer to the contracting officer's decision to grant extra time [through unilateral modifications]. He made no findings and therefore we do not really know whether he considered the defendant [the Government] to have caused any damaging delays at all...." *Robert E. Lee & Co. v. United States*, 164 Ct.Cl. 365, 370 (1964). Furthermore, Mr. Schmidt undercut any deference that might have been given to the extension days granted in the unilateral modifications when he testified that the extensions were not viewed by the ROICC as extensions due to a contractor because of government-caused delay. Therefore, the unilateral modifications are not accorded any weight in this court's findings in respect of government-caused delay.

#### b. Government claim

Defendant moved post-trial, pursuant to RUSCC 15(b), for leave to amend its answer to assert a counterclaim seeking repayment of $133,094.79 "in delay-based compensation that plaintiff has already received." Def's Br. filed Jan. 28, 1992, at 2. Defendant's theory is that plaintiff failed to carry his burden of proof at trial to establish compensable delay and that the delays recognized by the contracting officer for direct field labor cost and home office overhead should not stand. Plaintiff opposes the motion on the ground that jurisdiction is lacking to consider it.

The CDA requires that a claim by the Government seeking affirmative relief be

subject to a contracting officer decision before the Government can assert it in court. 41 U.S.C. § 605(a); *Seaboard Lumber Co. v. United States*, 903 F.2d 1560, 1561–62 (Fed.Cir.1990), *cert. denied* ——— U.S. ———, 111 S.Ct. 1308, 113 L.Ed.2d 243 (1991). Defendant's counterclaim comes within the purview of section 605(a). The contracting officer has not rendered a written decision on the claim that defendant wants to prosecute. Therefore, the Claims Court lacks jurisdiction to consider the claim.

■ Defendant also contends that a counterclaim is not a prerequisite for its receiving affirmative relief on review of a contracting officer's decision. Precedent exists that would allow the Claims Court to reduce the amount of a contracting officer's award in the context of a contractor's suit to increase the amount. The Court of Claims in *Irwin & Leighton v. United States*, 101 Ct.Cl. 455 (1944), a case obviously of pre-CDA vintage, held that, although the court should accord great weight to a contracting officer's determinations with respect to delay damages, the court could find that the delay was less than that found by the contracting officer. The Court of Claims stated:

> It is true that we are not bound by the findings of the contracting officer in a claim for damages due to delay (*Langevin v. United States*, 100 C.Cls. 15), but there is a strong presumption that the delay was not less than that found. The contracting officer, or his representative, had day to day contact with the work and was in the best position of anyone, except the contractor, to know the extent of the delay. He is supposed to weigh the facts with an even hand before rendering his decision; but it cannot be overlooked that he is the defendant's selection and its own employee. He is not apt to err on the side of the contractor and against his employer, whose interests he is employed to guard and protect. Unless the clear weight of the evidence shows the delay was less than that found by him, we think the defendant is bound by his finding....

101 Ct.Cl. at 475. The Federal Circuit in *Assurance Co. v. United States*, 813 F.2d 1202 (Fed.Cir.1987), relied on subsequent Court of Claims cases curtailing the amount of deference owed to a contracting officer's decision. The appeals court ruled that current government contract law allows a contract appeals board or the Claims Court to reduce, as well as to increase, an award made by a contracting officer:

> Before the Contract Disputes Act, 41 U.S.C. § 601 *et seq.*, was adopted, the Court of Claims held that an appeal to a contracts board, under the "disputes" clause of a Government contract, "vacated" the contracting officer's decision and entitled the contractor to a de novo hearing before, and de novo decision by, the board. *Southwest Welding & Mfg. Co. v. United States*, 188 Ct.Cl. 925, 413 F.2d 1167, 1184–85 (1969). Later, the Court of Claims again declared that a contract appeals board "was, of course, entitled to examine the matter de novo," and explicitly upheld a board reduction in the contracting officer's award with respect to the claim that had been appealed. *Blount Bros. Corp. v. United States*, 191 Ct.Cl. 784, 424 F.2d 1074, 1085 (1970).
>
> There is no reason to believe that, in enacting the Contract Disputes Act, Congress intended to change this established rule. On the contrary, the Disputes Act itself suggests that, where an appeal is taken to a board or court, the contracting officer's award is not to be treated as if it were the unappealed determination of a lower tribunal which is owed special deference or acceptance on appeal. The Act's provision dealing with the contracting officer's decision on a contractor's claims states: "Specific findings of fact are not required, but, if made, shall not be binding in any subsequent proceeding." 41 U.S.C. § 605(a). With respect to "direct access" suits (primarily in the Claims Court) seeking immediate judicial review of the contracting officer's decision, the Act provides that the court suit "shall proceed de novo in accordance with the rules of the appropriate court." 41 U.S.C. § 609(a)(3)....

813 F.2d at 1206. The Federal Circuit noted: "[O]ur holding is limited to the very same claim appealed by the contractor, in which the contractor seeks a larger award. We do not consider the boards' authority with respect to a part of the contracting officer's decision which has not been appealed, *i.e.*, a different claim." *Id.* 813 F.2d at 1206, note 6. Under both the CDA and *Assurance*, then, the contracting officer's findings are not binding on the Claims Court and the court is required to review plaintiff's claims de novo. In the present case, plaintiff appealed the final decision of the contracting officer in its entirety and, accordingly, the court may reduce any portion of the contracting officer's award to plaintiff.

Defendant seeks repayment of $133,-094.79, the amount recognized in the final decision as direct field labor costs and home office overhead. However, the contracting officer's final decision awarded only $17,295.46. The contracting officer arrived at this figure by subtracting payments received by plaintiff through unilateral modifications from the costs that the contracting officer calculated for direct field labor costs, home office overhead, and additional subcontractor work. At trial defendant argued that payments received through unilateral modifications did not compensate for delay and that the unilateral modifications did not amount to an admission by the Navy of government-caused delay on plaintiff's project. Defendant contends that it is entitled to repayment of the amount received by plaintiff through the unilateral modifications because plaintiff failed to prove compensable delay.

The court is without jurisdiction to mandate repayment of the sums received by plaintiff through unilateral modifications: These amounts are not an award pursuant to the contracting officer's final decision which this court would have jurisdiction to reduce under the CDA and *Assurance*, and the Government did not file a claim with the contracting officer seeking repayment of such amounts. 41 U.S.C. § 605(a) requires such a written claim by the Government as a prerequisite to the Government's assertion of a claim for affirmative relief. Thus, the maximum amount that defendant can claim by way of reduction is $17,295.46, the amount awarded to plaintiff by the contracting officer's final decision.

#### c. Contracting officer's final decision

The court has examined plaintiff's claims de novo. Due to the absence of a critical path analysis, and without giving any consideration to the contracting officer's decision, the court is unable to determine whether delays caused by the Navy were properly compensable as critical path delays. However, the contracting officer's decision is evidence before the court that must be considered and weighed. The contracting officer in awarding delay costs relied on a technical review, prepared by a technical analyst and supported by both the analyst's consultant and counsel who conducted a legal review of the analysis, which determined that plaintiff was entitled to delay damages for critical path delay attributable to the Navy.

Contracting Officer Lindstrom testified that, in rendering his decision, he attempted to weigh equally the interests of the Navy and the contractor. He stated that he relied on a technical review performed by the Engineering Construction Division. While the contracting officer did not personally review a critical path analysis for plaintiff's project or even know if one existed, he indicated that it was the practice of his office to ascertain that a compensable delay occurred before granting delay compensation. Contracting Officer Lindstrom viewed his award as granting critical path delay based on the determinations of the technical analyst and the support of the determinations by both the analyst's consultant and counsel who conducted a legal review of the analysis. Plaintiff's failure to present a critical path analysis at trial is an insufficient basis to reject the contracting officer's determinations of critical path delay days based on the technical analysis.

With respect to additional work days, the contracting officer allowed for 17 days in his calculations of damages, based on the

determinations of the technical analyst. Contracting Officer Lindstrom explained that although he did not know exactly how the technical analyst derived the days of additional work, typically daily reports or updated progress schedules would be probed for this information. While plaintiff's assertions were insufficient to establish additional work days beyond those allowed by the contracting officer, the evidence considered de novo does not provide the court with a basis for rejecting the contracting officer's determination, based on the technical analysis, that plaintiff is entitled to compensation for 17 days of additional work.

In *Assurance* the Federal Circuit reviewed the contract appeals board's rejection of the contracting officer's award for one claim and the board's reduction of the contracting officer's award for a second claim. The Federal Circuit determined that the board's decision was adequately supported based on the contracting officer's testimony before the board that no documentation had been provided by the contractor on the first claim and that the contracting officer had overstated the award on the second claim. 813 F.2d at 1206–07. Such facts, justifying rejection of the contracting officer's determinations of critical path delay days and additional work days, are not present in this case. Contracting officer Lindstrom did not disavow or undermine his decision except as to minor adjustments.

The contracting officer's award shall be modified to correct the errors that he noted at trial and to reflect other determinations of the court. Modifications to the award are, as follows:

1. The maximum number of days for which plaintiff can be compensated is 259 calendar days. This takes into account the court's findings that the correct number of days for bilateral modifications is 155; for weather delays, 33. 259 calendar days is equivalent to 185 work days ($259 \times \frac{5}{7} = 185$).

2. An additional 7 days are disallowed in calculating costs for the CQC representative since plaintiff served as CQC representative on 7 days more than the contracting officer's final decision determined.

3. Calendar days are not converted into work days when calculating costs for home office overhead since the rate for this cost is based on calendar days.

4. *Wilner I* is binding as to the rate for home office overhead for 1987. *Wilner I* established a daily rate of $281.00 for plaintiff's home office overhead. Collateral estoppel bars reopening this issue.

5. Plaintiff is entitled to 100 percent of the home office overhead rate for the delay days for which plaintiff is receiving compensation. *Wilner I* established that the project at issue accounted for 55.9 percent of plaintiff's work during the 1986–1987 period when the contract at issue in *Wilner I* was ongoing. *Wilner I*, 23 Cl.Ct. at 260. The completion date for that contract was March 10, 1987. After that date, the contract at issue was plaintiff's only project, and plaintiff is entitled to receive the full amount of the daily home office overhead rate for the period after March 10, 1987. The 259 days of delay for which plaintiff is receiving compensation occurred after March 10, 1987,[15] and plaintiff is thus entitled to the full home office overhead rate for these days.[16]

The above determinations result in the following modifications to the contracting officer's award:

---

**15.** The 155 days of extension granted by bilateral modifications plus the 33 days of extension for weather delay resulted in an extension of the contract completion date from October 1, 1986, to April 7, 1987.

**16.** *Capital Electric Co. v. United States,* 729 F.2d 743 (Fed.Cir.1984), does not prevent the court from awarding home office overhead costs to plaintiff. The $281.00 rate represents actual costs incurred by plaintiff that are compensable delay damages. The problem addressed by *Capital Electric,* unjustified costs, is not present here.

Direct Field Overhead Costs

Superintendent: (185–7) × \$326.47 = \$58,111.66
CQC Representative: (185–18) × \$161.10 = \$26,903.70

| | |
|---|---|
| SUBTOTAL | \$85,015.36 |
| Profit 6% × $^{17}/_{259}$ | 334.81 |
| SUBTOTAL | 85,350.17 |
| Bond 0.6% | 512.10 |
| TOTAL | \$85,862.27 |

Home Office Overhead

| | |
|---|---|
| \$281 × 259 = | \$72,779.00 |
| Profit 6% × $^{17}/_{259}$ = | 286.62 |
| SUBTOTAL | 73,065.62 |
| Bond 0.6% | 438.39 |
| TOTAL | \$73,504.01 |

---

The contracting officer calculated an amount of \$87,492.31 for direct field overhead costs and an amount of \$45,602.48 for home office overhead. The court's calculations thus increase the amount to which plaintiff is entitled as compensation for delay damages by \$26,271.49 (85,862.27 + 73,504.01 − 87,492.31 − 45,602.48).

## CONCLUSION

Accordingly, based on the foregoing,

1. Plaintiff is entitled to recover damages for delay caused by the Navy. By May 29, 1992, the parties shall file a stipulation as to the amount of judgment consistent with the bench ruling and this opinion, including 1) the amount awarded under the bench ruling; 2) the amount awarded by this opinion; 3) the dates from which interest is payable on each of 1) and 2) under the CDA; and 4) \$36,398.00, the amount of the check that plaintiff refused to cash. The Clerk of the Court shall enter judgment upon the filing of this stipulation. No costs will be awarded upon entry of judgment.

2. The court disallows interest under the CDA on the amount represented by the final check that plaintiff refused to cash.

3. Defendant's motion to file its counterclaim is denied due to lack of jurisdiction over the counterclaim.

IT IS SO ORDERED.